Jacquelyn Layne WILEY, Petitioner,

v.

Kelly SPRATLAN, Respondent.

No. B–5707.

Supreme Court of Texas.

July 14, 1976.

Rehearing Denied Sept. 29, 1976.

M. Eldred Smith, Longview, for petitioner.

Curtis L. Owen, Dist. Atty., George M. Conner, III, Asst. Dist. Atty., L. Michael Thompson, Tyler, for respondent.

POPE, Justice.

The courts below ordered the termination of the parent-child relationship between Mrs. Jacquelyn Wiley and her four-year-old daughter. Tex.Civ.App., 529 S.W.2d 616. We reverse the judgments of the courts below and render judgment denying the termination.

Kelly Spratlan, as the Supervisor of Welfare of Smith County, instituted this termination suit against both the father and mother, but the father filed an affidavit of relinquishment and defaulted. Only Mrs. Wiley, the mother, has contested the suit for termination. The only basis for termination asserted by Spratlan for the Welfare Department is this part of Section 15.02 of the Family Code [1]:

"A petition requesting termination of the parent-child relationship with respect to a parent who is not the petitioner may be granted if the court finds that:

(1) the parent has:

\* \* \* \* \* \*

(E) failed to support the child in accordance with his ability during a period of one year ending within six months of the date of the filing of the petition;

\* \* \* and

(2) termination is in the best interest of the child."

■ The trial court found that the mother failed to comply with Section 15.02(1)(E) during the period from July 17, 1973, to July 16, 1974, and that it was in the best interest of the child to terminate the parent-child relationship under Section 15.-02(2). Both elements are essential to the judgment. The findings of fact [2] and the evidence do not support the judgment of termination.

In February of 1973 the Wileys were engaged in a divorce proceeding. On February 22, 1973, they delivered the temporary possession of their child to the Child Welfare Unit and the Unit then requested each parent to contribute $33.00 toward the support of the child while she lived in a foster home. According to the findings, Mrs. Wiley became delinquent in the amount of $273.00 during the one-year period but during that same time she was able to earn a total of only $1050.00 plus an unknown amount of tips for an additional two weeks. The undisputed proof shows additionally that during January, February, and March of 1974 she obtained lodging in exchange for her services as a cleaning woman in an apartment complex. She borrowed sums of money from her sisters for sustenance and her parents brought her canned goods and clothing. She was able to keep a small savings account of $500.00.

| Employment | Salary |
|---|---|
| October, 1973, one to one and a half weeks at a 'U-Totem'. | Not stated. |
| December, 1973, and January, 1974, more than one month at 'The Other Place'. | $50 per week, plus tips. |
| March, 1974, and April, 1974, two months at 'Golden Girl Enterprises'. | Between $300 and $400 a month. |

During the same on [sic] year period between July 17, 1973, and July 16, 1974, JACQUELYN LAYNE WILEY had lump sum savings accumulated as follows:

| | |
|---|---|
| August, 1973 | $500 or more." |

[TR. 55–56].

---

1. Section 15.02(1)(E) was changed to 15.02(1)(F) effective September 1, 1975. Unless otherwise noted all statutory references are to Tex.Fam. Code Ann. (1975).

2. "2. During the one year period between July 17, 1973 and July 16, 1974, JACQUELYN LAYNE WILEY paid support for JAMIE LEIGH WILEY as follows:

| August 6, 1973 | $33.00 |
|---|---|
| May 14, 1974 | 30.00 |
| July 2, 1974 | 30.00 |
| TOTAL | $93.00 |

During the same one year period between July 17, 1973, and July 16, 1974, JACQUELYN LAYNE WILEY attempted to make support payments as follows:

| April 5, 1974 | $30.00 |
|---|---|

3. During the one year period between July 17, 1973, and July 16, 1974, JACQUELYN LAYNE WILEY had employment which produced salary or wages as follows:

The trial court found as a fact that Mrs. Wiley paid $33.00 in August, 1973, during the first month of the one-year period after her agreement with the Welfare Unit. She attempted to make a payment of $30.00 by money order in April of 1974 which was not received, and she paid $30.00 in May and $30.00 in July. It was during January, February, and March that she earned only her rent as a cleaning lady. The undisputed proof further showed that she sent Easter, Christmas, and birthday gifts, as well as some clothes to her baby. This proof of income and contributions is all of the evidence in support of the sole basis for termination, namely, Mrs. Wiley "failed to support the child in accordance with her ability during a period of one year ending within six months of the date of the filing of the petition."

■ The required period of nonsupport commenced not sooner than some time after August 6, 1973, which defeats the one-year period mandated by the Family Code. This was the holding in our recent decision in *Cawley v. Allums*, 518 S.W.2d 790 (Tex. 1975). In that case the question was whether a father had failed to support his child during a period of two years which was required before a child could be taken from a parent for adoption under section 6(a) of article 46a, Tex.Rev.Civ.Stat.Ann. This is the provision interpreted in *Cawley*:

. . . or if such parent or parents shall have not contributed substantially to the support of such child during such period of two (2) years commensurate with his financial ability, . . .

We ruled that two years meant twenty-four months and not nineteen months, and the new Family Code has carried forward this interpretation of the former law. Section 15.02(1)(E) of the Family Code provided for termination if:

(1) the parent . . . (E) failed to support the child in accordance with his ability during a period of one year ending within six months of the date of the filing of the petition.

The new Family Code omits the words "contributed substantially" found in Section 6(a) of Article 46a, and it reduced the time period of nonsupport from twenty-four months to one year. The substitution of the new phrase "in accordance with his ability" for the words "commensurate with his financial ability" does not support an interpretation that the Legislature intended to change the rule which was announced in *Cawley*. The words "commensurate with" mean "in accordance with."

An extensive treatment of the Family Code is found in the article by Eugene L. Smith, *Termination of the Parent-Child Relationship*, 5 Tex.Tech.L.Rev. 437 (1974). The article is one of several submitted by the scholars who drafted the code. Professor Smith writes at p. 440: "Phrase (E) is derived from Tex.Rev.Civ.Stat.Ann. art. 46a, Sec. 6, which authorized dispensation with a parent's consent to adoption upon failure to support the child for an extended period of time." There is no mention of an intent to do more than reduce the time. Just as two years did not mean nineteen months in *Cawley*, so also one year does not mean eight months in this case. The proof is that Mrs. Wiley provided or offered support for four of the twelve months and that she was living at a poverty level during the entire one-year period.

■ Involuntary termination of parental rights rests upon Section 15.02. Subdivision (1) of that Section lists several acts or omissions, one or more of which must be proved in a termination case. The list may not be an exclusive one, but so far as this case is concerned, the Welfare Unit relied only upon Section 15.02(1)(E). Subdivision (2) of the same Section requires proof of a second element, that the termination is in the best interest of the child. Both elements must be established and the requirements of Subdivision (1) are not excused because a court may be of the opinion that Subdivision (2) has been proved.

Suits for conservatorship, possession, and support are governed by Chapter 14 of the Family Code and those matters are determined by the "best interest" test. Section 14.07. Those proceedings are different and have different purposes from termination

cases. Decrees under Chapter 14 may be modified or changed from time to time, but the parent still retains some rights in and control over a child. A termination decree, on the other hand, is complete, final, irrevocable. It divests for all time the parent and child of all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit. See Section 15.07. The difference in the proceedings justifies the caution with which courts have characteristically considered termination cases.

 Actions which break the ties between a parent and child "can never be justified without the most solid and substantial reasons." *State v. Deaton*, 93 Tex. 243, 54 S.W. 901 (1900). Particularly in an action which permanently sunders those ties, should the proceedings be strictly scrutinized. This court has always recognized the strong presumption that the best interest of a minor is usually served by keeping custody in the natural parents. *Herrera v. Herrera*, 409 S.W.2d 395 (Tex.1966); *Gunn v. Cavanaugh*, 391 S.W.2d 723 (Tex.1965); *Mumma v. Aguirre*, 364 S.W.2d 220 (Tex. 1963). *Mumma* says:

> The presumption is based upon a logical belief that the ties of the natural relationship of parent and child ordinarily furnish strong assurance of genuine efforts on the part of the custodians to provide the child with the best care and opportunities possible, and, as well, the best atmosphere for the mental, moral and emotional development of the child.

 The natural right which exists between parents and their children is one of constitutional dimensions. *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The presumptive right of parents is grounded on good policy considerations.

Although "natural right" has developed firm roots in family law, the mere label obviously provides little concrete justification for protecting parents' interests. Modern theories of child welfare, however, offer persuasive support to parental rights, and suggest that the legal system should generally defer to the wishes of a child's parents, obliging the state to bear a serious burden of justification before intervention. *State Intrusion into Family Affairs: Justification and Limitations*, 26 Stanford L.Rev. 1383, 1385 (1974).

Mrs. Wiley proved that by the time of the trial in January, 1975, her financial condition had improved to the point that she had taken a training course to prepare herself for permanent employment which she had already obtained. She undertook the training so she could get out of bars as a cocktail waitress. According to the testimony of a welfare worker at the time of trial, Mrs. Wiley was living alone in a "real cute" apartment. When the welfare worker visited Mrs. Wiley, unannounced, she found her apartment was clean, uncluttered and well-kept. She said that Mrs. Wiley should be commended for improving her working conditions.

We conclude that there is no evidence to support the findings or the conclusion that Mrs. Wiley failed to support her child in accordance with her ability for the period of time required by the Family Code. The judgments of the courts below are reversed and judgment is rendered that the termination of the parent-child relationship is denied.

Dissenting Opinion by McGEE, J., in which GREENHILL, C. J., and DENTON and SAM D. JOHNSON, JJ., join.

Concurring Opinion by STEAKLEY, J.

STEAKLEY, Justice (concurring).

I did not agree with the majority in *Cawley v. Allums*, 518 S.W.2d 790 (Tex.1975), as evidenced by joinder in the dissent. But I accept it as applicable here as written by the majority.

McGEE, Justice (dissenting).

I respectfully dissent.

In the present case, Jacquelyn Wiley was requested by the Welfare Unit to make monetary contributions of only $33 a month toward the financial support of her child. Over a one-year time span, these monthly payments amounted to a total of $396 for the care, feeding, and boarding of her infant. While Mrs. Wiley was obviously not wealthy, she was certainly not impoverished. She had a "cute" apartment, the financial support of her parents, the monetary aid of her boyfriend, and $500 in her savings account. As a practical matter, what did Mrs. Wiley contribute to the support of her child from July 17, 1973 to July 16, 1974? The record reveals that she paid a total of $93 toward the support of her infant during that one-year time period. Obviously, $93 will not fully support a child for one entire year; the remainder of that financial burden was therefore required to be borne by the state.

The majority relies on *Cawley v. Allums*, 518 S.W.2d 790 (Tex.1975), as authority for its interpretation of the controlling Section 15.02(1)(E) dealing with nonsupport. I contend that *Cawley* has no application in the case now before us. The old adoption statute under review in *Cawley* was Article 46a, Section 6(a), which read in pertinent part as follows:

"Except as otherwise provided in this section, *no adoption* shall be permitted *except* with the written consent of the living parents of the child; *provided, however*, that if a living parent or parents shall voluntarily *abandon* and desert a child sought to be adopted, *for a period of two (2) years*, and shall have left such child to the care, custody, control and management of other persons, *or* if such parent or *parents shall have not contributed substantially to the support* of such child *during such period of two (2) years commensurate with his financial ability*, then, in either event, it shall not be necessary to obtain the written consent of the living parent or parents in such default." [Emphasis added].

In *Cawley* the court was faced with the problem of determining the meaning of that portion of Section 6(a) which dealt with the two-year time period established under the failure to support provision. In construing the above statute, the court stated that "[t]he case requires a construction of the words 'during such period of two (2) years.' " In order to gain insight as to the meaning of the two-year support portion set out in Article 46a, it was announced that *Section 6(a) would be examined in its entirety*. The court first considered Section 6(a) with reference to the *uninterrupted two-year period of abandonment* required in order for adoption to be allowed without the written consent of the parent due to parental desertion. In next discussing the failure to support component of Section 6(a), the court concluded that "[t]he word 'such' refers to the kind of time lapse required under the abandonment and desertion provision of the statute. It is 'such' period, meaning that *it is the same kind of and is like the time requirement applicable to abandonment*." [Emphasis added]. It is evident that the court in *Cawley* was faced with construing the wording of a statute somewhat at variance with the one presently before us. Further, in the instant case the statutory language under consideration is clear and obviously independent of, and in no way related to, any other statutory provision such as abandonment. Since *Cawley* interpreted a statutory provision which differs in significant respects from the statute we are presently examining and since *Cawley* is factually distinguishable from the present controversy, I view that decision as having no application in the case now before us.

The complete wording of the statute involved in the present case is: " . . . failed to support the child in accordance with his ability during a period of one year ending within six months of the date of the filing of the petition . . . ." I believe that the Legislature intended that Section 15.02(1)(E) provide for a determination of the applicable one-year period to be considered and for an examination of the sup-

port payments made by the parent during this one-year period. Thus, the rule I would enunciate is that the number and amount of the payments made should be compared to the parents' income and other sources of earnings throughout the entire period. Income, savings, overall financial condition, financial problems encountered and excuses should be viewed together over the entire year when a failure to support is asserted as a ground for termination. Through such an extensive evaluation it would ultimately be determined whether or not the parent failed to support the child "in accordance with his ability," during the one-year period under consideration. The ability of an individual to pay will inevitably vary depending on the facts and circumstances of each particular case. Nevertheless, unlike the majority, I would not eliminate the phrase, "in accordance with his ability," from the operative language of the statute.

Applying the rule as previously set out, I would conclude that there is evidence of probative force to support the trial court's finding with reference to petitioner's failure to support under Section 15.02(1)(E). With regard to the conclusion of the trial judge that it would be in the best interest of the child if termination were ordered, I believe there is also ample evidence to support that finding. I will briefly summarize only a portion of the essential and material information as follows: The infant involved in this case was voluntarily placed with the Child Welfare Unit and remained under its care and supervision for some 17 months before this termination suit was instituted. The record shows that this was the third marriage of the petitioner which had failed and that she earlier had two other children by virtue of the prior marriages. One of these two children was left in the custody of her ex-husband and the other child had been adopted after the petitioner had voluntarily signed a document giving her consent to the adoption. The petitioner was receiving financial assistance from her parents as well as from her boyfriend and while she had also accumulated significant financial savings, only $93 in

support payments were made throughout this one-year period. There was testimony to the effect that when the child had first been transferred to the care and control of the Welfare Unit, that the infant was behind in both physical development and emotional stability. It is apparent from this record that there is some evidence to support the findings and conclusions of the trial judge.

The problem raised in the instant case is partly due to the majority's reliance on the *Cawley* rationale. With reference to Mrs. Wiley's failure to make various support payments, the majority has stated that since she made a payment on August 6, 1973 "[t]he required period of nonsupport commenced not sooner than some time after August 6, 1973, which defeats the one-year period mandated by the Family Code." Thus, what *Cawley* would seem to hold is that you may not begin the running of the one-year period of nonsupport until an initial month exists where no payment has been made. However, what is the rest of the rule as enunciated in *Cawley* and applied in the instant case? How has Section 15.02(1)(E) as presently drafted been interpreted by the majority? At what point in time *after* August 6, 1973 would the one-year time period start to run? Does the majority intend to hold that if a parent fails to make *any* support payments for eleven months and succeeds in forwarding a financial contribution on the twelfth month, that the running of the one-year period of nonsupport has been tolled and termination may not be allowed?

Let us assume that between the months of January 1, 1975 and December 31, 1975 a wealthy father or mother forwards a support payment only in the month of December. When may the one-year nonsupport time period begin to run for purposes of ascertaining whether grounds exist calling for termination? How may one full year of nonsupport *ever* be found to exist in such situations? Must the inattentive parents' 11 prior failures to pay be disregarded forever? Are we to erase from existence the fact that the parent failed or refused to

make 11 out of 12 payments simply because he manages to slip in one payment per year? Should we allow one payment to cure 11 prior deficiencies? May a neglectful parent continue to make one out of every six, or one out of every 12 payments and avoid forever the existence of a one-year period of nonsupport and thereby successfully evade termination? Is *complete* nonsupport for one year required before termination will be allowed? Such would seem to be the intention of the majority as their opinion states: "Just as two years did not mean nineteen months in *Cawley,* so also one year does not mean eight months in this case." Thus, applying the reasoning of the majority to the single yearly payment hypothetical, termination would never be allowed as "one year does not mean *eleven* months."

The statutory interpretation espoused by the majority is certainly not clear. In cases of this nature, guidance and clarity are absolutely essential to those persons affected by such rulings as well as to trial judges attempting to apply them. I would not so heavily emphasize and favor the rights of neglectful parents. The making of periodic token payments should not be allowed to create a situation in which an infant must indefinitely remain in the hands of a state welfare unit or in the care of foster homes. Children require the existence of love and environmental and emotional stability in their lives. The reasoning of the majority will not facilitate the attainment of these goals. I would affirm the judgment of the Court of Civil Appeals.

GREENHILL, C. J., and DENTON and SAM D. JOHNSON, JJ., join in this dissent.