# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00480-CV

**Eric Loper, Appellant**

**v.**

**Texas Department of Protective and Regulatory
Services and C.L., Appellees**

## FROM THE DISTRICT COURT OF HAYS COUNTY, 274TH JUDICIAL DISTRICT
## NO. 01-0839, HONORABLE CHARLES RAMSAY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Eric Loper appeals a district-court judgment terminating his parental rights to his minor child, appellee C.L.,[1] approximately age two at the time of trial. Appellee the Child Protective Services division of the Texas Department of Protective and Regulatory Services (ACPS@) filed a petition for termination of Loper=s parental rights. *See* Tex. Fam. Code Ann. ' ' 101.032, 161.001 (West 2002). After a bench trial, the district court terminated Loper=s parental rights to C.L. In his only issue on appeal, Loper asserts that the evidence is legally and factually insufficient to establish the statutory grounds for termination. We will affirm.

---

[1] The decree also terminated the parental rights of Lauren Loper to her daughter, C.L. Lauren Loper has not appealed. We thus do not address the termination of her parental rights.

## BACKGROUND

By his only issue on appeal, Loper argues that the evidence against him was legally and factually insufficient to terminate his parental rights.

CPS removed C.L. from her parents= home and took custody of her after receiving multiple referrals regarding the child. First, CPS received a referral alleging Loper neglectfully supervised C.L. in February 2001. This referral came after an Austin police officer arrested Loper and charged him with child endangerment, after finding Loper pulled over to the side of the road, apparently Aunder the influence,@ and with C.L. in the vehicle.[2] Loper=s employer terminated Loper=s employment after he arrived at work Aunder the influence.@[3] In this condition, Loper had driven with C.L. in the car to his job site, requiring his employer to drive Loper home and place C.L. in the care of neighbors.

---

[2] The record does not indicate the substance of which Loper was under the influence, but Austin police noted that Loper Aappeared glassy eyed and his speech was very slow.@

[3] Again, the record does not indicate the substance of which Loper was under the influence, but the record notes that the employer Awas so concerned about Mr. Loper=s inability to drive, he refused to allow him to get into his car.@

On May 1, CPS received three additional referrals alleging neglectful supervision of C.L. by Loper and his wife, C.L.=s mother, Lauren Loper. Loper was observed driving erratically, running off the highway into the grass, and eventually turning into an Austin grocery store parking lot. Observers saw Loper exit his vehicle, urinate in the parking lot, stagger into the store, and leave then one-year-old C.L. alone in the car. When an Austin police officer arrived at the grocery, he detained Loper and discovered store merchandise in Loper=s pockets. Although Loper=s blood-alcohol level was only .02, he failed a field sobriety test. Loper refused a blood test. Police arrested Loper for child endangerment and driving while intoxicated. Loper=s mother retrieved C.L. from the police station. Two days later, C.L.=s maternal great-grandmother attended a birthday party for Lauren Loper at the Loper home. She noticed what appeared to be fresh needle track marks on Loper=s arms and feet, indicating the use of drugs.

CPS asked for, and the district court entered, an AOrder for Protection of a Child in an Emergency.@ The district court appointed CPS as C.L.=s temporary managing conservator and placed C.L. with her maternal grandmother, Rebecca Dallman. In July the district court held an adversarial hearing on CPS=s request for temporary orders and found that returning C.L. to the Loper home posed a continued risk to her physical health and safety. The district court ordered Loper to: (1) visit with C.L. on a weekly basis, during which time Loper was to remain drug-and-alcohol free; (2) submit to a psychological evaluation; (3) attend and complete counseling sessions; (4) successfully complete parenting classes; (5) submit to drug and alcohol assessments and random drug testing; (6) maintain secure, stable housing and employment; and (7) maintain a

drug-and-alcohol-free lifestyle.  At a later status hearing, the district court ordered that Loper pay $100 per month in child support for C.L.  The district court held a hearing in December to review the conservatorship appointment and placement of C.L.  Loper failed to attend the hearing.

Loper failed to comply with many of the district court=s directives.  Loper did submit to the psychological evaluation and the drug-and-alcohol assessments.  However, he failed to comply with an intensive outpatient program, after being expelled for refusing to comply with all of the random drug tests and producing some Adirty@ specimens.  Further, he failed to attend any therapy sessions recommended after his psychological evaluation.  Loper was dismissed from the parenting classes after exhibiting behavior consistent with drug use and testing positive for opiates during a urinalysis.  Loper failed to make any of the ordered child-support payments.  Of forty available weekly visitations with C.L., Loper took advantage of only ten.  He failed to visit C.L. at any time during the period between October 2001 and the April 2002 termination proceedings.  Loper also failed to maintain stable housing or employment.  In February 2002, CPS placed C.L. with her maternal uncle, Dillon Howard, and his fiancee, Nicole Meadows, who intend to adopt C.L.

At the termination proceedings, Loper was called to testify.  Loper testified only to his name, his age, his date of birth, and the fact that he was C.L.=s father.  Loper asserted his Fifth Amendment right against self-incrimination on all other matters.  *See* U.S. Const. amend. V. Specifically, he refused to answer questions regarding whether he was incarcerated at the time of the trial, whether he had been arrested for child endangerment, and whether he had ever engaged

in conduct that would endanger the physical or emotional well-being of C.L. Loper offered no other evidence to controvert allegations regarding his drug use, his arrests, or his treatment of C.L.

Dallman testified that, within a year of the trial, Loper admitted to using heroin and needing help with his addiction. Dallman said she suspected, on several occasions, that Loper had been under the influence of drugs. Dallman testified that in early 2001, she found Loper and his wife under the influence of drugs at their home. She took the two to a counselor and social worker at the school where she teaches in order to discuss the Lopers= problems with drug addiction. The counselor and social worker provided Loper and his wife with numerous referrals for rehabilitation programs.

Dallman testified that she thought termination of the Lopers= parental rights served C.L.=s best interest. Dallman said, that although C.L. seemed healthy, she believed the Lopers placed C.L. in dangerous situations. She also believed the Lopers failed to provide C.L. with adequate stimulation. Particularly, Dallman noted that the Lopers often stayed out late at night and slept much of the day, keeping C.L. confined while they slept. Dallman said when C.L. was not confined, the extreme disarray in the Loper home threatened C.L.=s safety. Dallman worried that the Lopers= inattention might result in C.L. placing a foreign object in her mouth or having some other sort of accident.

CPS caseworker Lori Browning testified that she thought termination of Loper=s parental rights was in C.L.=s best interest. Browning testified that she believed Loper=s continued

5

substance abuse greatly diminished his capacity to effectively parent C.L. She expressed concerns about the stability Loper could offer C.L. because he failed to perform almost all of the court-ordered programs, failed to remain drug-free, failed to visit C.L. weekly, failed to pay any child support for C.L., and failed to maintain stable housing and employment. Browning also testified that Loper=s current incarceration posed a threat to the stability and permanency C.L. needs in her home life.

The district court ruled that the parent-child relationship between Loper and C.L. should be terminated because Loper knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the physical or emotional well-being of the child. *See* Tex. Fam. Code Ann. ' 161.001. The court determined that termination of the parent-child relationship was in the child=s best interest.

## DISCUSSION

*Standard of Review*

The natural right existing between a parent and child is of constitutional dimension. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). The United States Supreme Court has characterized the right to raise one=s child as essentialCa basic civil right far more precious than property rights. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). Because the involuntary termination of parental rights is complete, final, and irrevocable, termination proceedings must be strictly scrutinized. *Holick*, 685 S.W.2d at 20.

6

A court may terminate parental rights if it finds both of the following: (1) that the parent has engaged in any of the specific conduct enumerated in the family code as grounds for termination, and (2) that termination is in the best interest of the child. Tex. Fam. Code Ann. ' 161.001; *Richardson v. Green*, 677 S.W.2d 497, 499 (Tex. 1984). A termination order must be supported by clear-and-convincing evidence. Tex. Fam. Code Ann. ' 161.001. AClear and convincing evidence@ means Athe measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.@ Tex. Fam. Code Ann. ' 101.007 (West 2002); *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980). This intermediate standard falls between the usual preponderance of evidence standard in civil cases and the Abeyond a reasonable doubt@ standard of criminal proceedings. *In re G.M.*, 596 S.W.2d at 847. The fact finder must determine that clear-and-convincing evidence supports both elements; proof of one element does not relieve the burden of proving the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976).

We review legal sufficiency by considering only the evidence supporting the trial court=s finding, disregarding evidence contrary to that finding and upholding the finding if any probative evidence supports it. *In re King=s Estate*, 244 S.W.2d 660, 661 (Tex. 1951). If more than a scintilla of probative evidence supports the finding, it must be upheld. *See Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). We will uphold termination findings against factual-sufficiency challenges if the evidence Ais such that a reasonable [fact finder] could form a firm belief or conviction that grounds exist for termination under Texas Family Code sections 161.001 and

7

161.206(a).@ *In re C.H.*, 89 S.W.3d 17, 18-19 (Tex. 2001). Thus, we will not reverse the district court=s judgment unless the fact finder could not reasonably have formed a firm conviction or belief that terminating Loper=s parental rights was in C.L.=s best interest. *Id*. at 25. Applying these standards of review to the facts before us, we hold the evidence to be both legally and factually sufficient to sustain the verdict.

*Best Interest of the Child*

Loper complains that there is insufficient evidence to support the district court=s finding that termination of his parental rights serves the best interest of C.L. A strong presumption exists that preserving the parent-child relationship serves the best interest of the child. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976).

In *Holley*, the Texas Supreme Court articulated several factors that trial courts may consider when determining whether termination serves a child=s best interest: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent, which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72.

8

Although this list is not exhaustive, it does include the most important considerations. *Id*. at 372. Other factors may be considered when appropriate. *Id*. Likewise, a fact finder is not required to consider all of the listed factors. *Id.* The record in this case contains evidence regarding several of the *Holley* factors.

*1. The emotional and physical danger to the child*

The record contains evidence of several instances in which Loper placed C.L. in danger. First, he was arrested for child endangerment after Austin police found him pulled over to the side of the road and under the influence of some substance, with C.L. in the vehicle. On another occasion, Loper drove himself and C.L. to his place of employment while he was Aunder the influence.@ Loper was again arrested by Austin police after driving under the influence of alcohol with C.L. in the car, staggering into a grocery store, stealing items, and leaving one-year-old C.L. alone in the vehicle. Dallman=s testimony suggested that Loper had been under the influence of heroin on several occasions in front of his daughter.

The general condition of the Loper home also presented a danger to C.L.=s well-being. Both Dallman and the CPS caseworker testified that the floor was littered with items that C.L. could either fall upon or place in her mouth.

The emotional danger presented to C.L. also was testified to by both Dallman and Browning. Dallman noted that Loper and his wife often stayed out very late at night and slept for much of the day. While sleeping, the Lopers kept C.L. confined. Dallman testified that she believed C.L. failed to receive appropriate stimulation from Loper. Browning testified that

9

Loper=s continued drug use posed a threat to the stability and permanency needed by C.L.  She further addressed concern that Loper=s incarceration threatened C.L.=s emotional needs.

*2.  Loper=s parental abilities*

The record contains evidence revealing Loper=s deficient parenting skills.  As described above, the Loper home was in extreme disarray and unsafe for a toddler C.L.=s age when both Dallman and CPS visited.  During the day, Loper often kept C.L. confined while he slept, failing to provide her with stimulation or attention.  Testimony from Dallman suggests that Loper used heroin with C.L. in the home on more than one occasion.

Loper placed C.L. in physical danger by driving Aunder the influence@ with her in the car on several occasions.  On one of these occasions, Loper left the one -year old alone in a car, while he urinated in a grocery store parking lot, staggered into the store, and stole merchandise.

Further, in direct defiance of court orders, Loper failed to visit C.L. for months at a time, including failing to visit her even once for almost six months before the termination proceeding.  Loper failed to provide any financial support for C.L.=s benefit, again in direct disobeyance of a court order.  Evidence reflects that Loper is incapable of maintaining a drug-free lifestyle, stable employment, or stable housing.  Finally, at the time of trial Loper was again incarcerated for an indeterminate amount of time.

*3.  Parenting-assistance programs available to Loper*

The district court ordered Loper to attend and complete a nine-week parenting course. Loper arrived tardy to a number of the classes. Loper completed only six of the nine weeks because instructors asked him to leave. During the classes, Loper exhibited behavior consistent with drug use. Loper also tested positive for opiates during one of the class=s urinalyses.

Loper did complete a drug-and-alcohol assessment, but he failed to complete a recommended outpatient rehabilitation program; he missed two classes after being arrested for burglary of a vehicle and shoplifting. Loper also completed a psychological evaluation, but he failed to attend any of the individual therapy sessions recommended by the evaluating psychologist. Testimony from Dallman established that school counselors provided Loper with referrals for drug treatment and rehabilitation programs. Loper failed to contact any of these individuals.

*4. Plans for the child by Loper or by the agency seeking custody*

Loper presented no evidence to indicate any plans he has for C.L.=s future. Because he failed to complete his ordered parenting programs, failed to maintain stable employment or housing, and was incarcerated at the time of the termination hearing, Loper=s failure to offer evidence of his plans for C.L.=s future complicate his position on this issue.

CPS presented evidence that C.L.=s current caretakers have expressed plans to formally adopt C.L. if Loper=s parental rights are terminated. Howard and Meadows currently are engaged and intend to marry. Howard serves as a flight instructor, and Meadows is a school

11

teacher. CPS produced evidence that the two can, and desire to, offer C.L. a secure, loving home life. They plan to provide her with financial stability, a drug-free environment, and adequate emotional support and physical stimulation for a child her age.

## 5. *Stability of the proposed home or proposed placement*

Loper provided no evidence to controvert CPS=s evidence that he failed to provide a stable home life for C.L. Although under court order to do so, Loper failed to maintain a stable job or stable housing. The evidence suggests he has failed to remain drug-free. Loper currently is incarcerated.

Howard and Meadows both maintain stable employment. They offer stable housing and financial support for C.L. It appears from the evidence that C.L. has been well-adjusted and emotionally nurtured while in their care.

## 6. *Acts or omissions by Loper and excuses for those acts or omissions*

A parent=s acts or omissions can also indicate an inappropriate parent-child relationship. *See Holley*, 544 S.W.2d at 372. Loper=s driving under the influence of alcohol with C.L. in the vehicle is an example of an act that casts doubt on Loper=s ability to parent effectively. Further, Loper=s consistent drug use, dismissal from court-ordered programs, recurring arrests, and incarceration also suggest Loper=s lack of parenting skills. Loper=s failure to complete court-ordered programs, to maintain a stable home and employment, to visit C.L., and to provide for C.L. financially are all omissions that reflect negatively upon Loper=s parenting abilities. Loper=s

12

failure to stimulate C.L. and his failure to keep his house safe for his daughter also suggest Loper=s inadequate parenting skills.

Loper made no attempts to controvert evidence of any of the above discussed acts or omissions. He failed to follow the district court=s orders, which were intended to indicate his readiness to have C.L. returned to his care. Further, at trial, Loper asserted his right against self-incrimination on all questions, including those regarding his fitness as a parent, his previous treatment of C.L., and his current incarceration. Although this action fell within Loper=s rights, in a civil case, a fact finder may Adraw reasonable inferences from a party=s assertion of the privilege against self-incrimination.@ *Lozano v. Lozano*, 52 S.W.3d 141, 150 (Tex. 2001). Loper provided no other testimony to excuse any acts or omissions relevant to this matter.

## CONCLUSION

The record conclusively demonstrates that the district court received sufficient evidence regarding the emotional and physical danger to C.L., Loper=s parenting ability, his failure to take advantage of offered parenting-assistance programs, his lack of plans for C.L.=s future, the instability of the home offered by Loper, and Loper=s failure to provide excuses for his acts and omissions as a parent. Having reviewed all the evidence, we hold there was clear-and-convincing evidence supporting the district court=s finding that it was in C.L.=s best interest to terminate Loper=s parental rights. Accordingly, we affirm the district court=s judgment.

_____

Lee Yeakel, Justice

Before Justices Kidd, Yeakel and Patterson

Affirmed

Filed:   April 3, 2003

14