NO. 12-10-00336-CV

 

IN THE COURT OF APPEALS          

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

                                                                        §                      APPEAL
FROM THE 349TH

IN THE INTEREST OF                                           

                                                                        §                      JUDICIAL
DISTRICT COURT 

K.O., A CHILD

                                                                        §                      ANDERSON
COUNTY, TEXAS







MEMORANDUM
OPINION

F.R.O.
appeals the termination of his parental rights. In two issues, F.R.O.
challenges the order of termination.  We affirm.

 

Background

F.R.O.
is the father of K.O., born January 7, 2009.[1]  When K.O. was three months
old, the Department of Family and Protective Services (the “Department”) filed
a first amended petition for protection of K.O., for conservatorship, and for
termination of F.R.O.’s parental rights.  The Department was appointed temporary
managing conservator of K.O.  At the conclusion of the trial on the merits, the
jury found, by clear and convincing evidence, that F.R.O. had engaged in one or
more of the acts or omissions necessary to support termination of his parental
rights, and that termination of the parent-child relationship between F.R.O.
and K.O. was in the child=s
best interest.  Based on these findings, the trial court ordered that the
parent-child relationship between F.R.O. and K.O. be terminated.  This appeal
followed.

 

Termination of Parental Rights

Involuntary
termination of parental rights embodies fundamental constitutional rights. Vela
v. Marywood, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), pet. denied
per curiam, 53 S.W.3d 684 (Tex. 2001);  In re J.J., 911
S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied).  A termination decree
is Acomplete, final,
irrevocable [and] divests for all time the parent and child of all legal
rights, privileges, duties, and powers with respect to each other except for
the child=s right to
inherit.@  Wiley
v. Spratlan, 543 S.W.2d 349, 352 (Tex. 1976); In re Shaw,
966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.)  Because a termination action Apermanently
sunders@ the bonds
between a parent and child, the proceedings must be strictly scrutinized.  Wiley,
543 S.W.2d at 352; In re Shaw, 966 S.W.2d at 179.  However,
parental rights are not absolute, and it is vital that the emotional and
physical interests of the child not be sacrificed at the expense of preserving
that right.  In re C.H., 89 S.W.3d 17, 26 (Tex. 2002).

A
court can order termination of parental rights if two elements are
established.  Tex. Fam. Code Ann. § 161.001
(Vernon Supp. 2010); In re J.M.T., 39 S.W.3d 234, 237 (Tex.
App.–Waco 1999, no pet.).  First, the parent must have engaged in any one of
the acts or omissions itemized in the first subsection of the statute.  Tex. Fam. Code Ann. § 161.001(1)
(Vernon Supp. 2010); Green v. Texas Dep’t of Protective & Regulatory
Servs., 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); In
re J.M.T., 39 S.W.3d at 237.  Second, termination must be in the best
interest of the child.  Tex. Fam. Code
Ann. § 161.001(2) (Vernon Supp. 2010); In re J.M.T., 39
S.W.3d at 237.  Additionally, both elements must be established by clear and
convincing evidence, and proof of one element does not alleviate the petitioner=s burden of proving the
other.  Tex. Fam. Code Ann. §
161.001; Wiley, 543 S.W.2d at 351; In re J.M.T., 39
S.W.3d at 237. 

Due
process requires a petitioner to justify termination by clear and convincing
evidence because termination is such a drastic remedy.  In re J.M.T.,
39 S.W.3d at 237.  The clear and convincing standard for termination of
parental rights is both constitutionally and statutorily mandated.  Tex. Fam. Code Ann. § 161.001; In
re J.J., 911 S.W.2d at 439.  Clear and convincing evidence means Athe measure or degree of
proof that will produce in the mind of the trier of fact a firm belief or
conviction as to the truth of the allegations sought to be established.@  Tex. Fam. Code Ann. § 101.007 (Vernon 2008).  There is a
strong presumption that the best interest of the child is served by preserving
the parent-child relationship.  Wiley, 543 S.W.2d at 352; In
re J.M.T., 39 S.W.3d at 240.  Thus, the burden of proof is upon the
person seeking to deprive the parent of their parental rights.  In re
J.M.T., 39 S.W.3d at 240.

 

Standard of Review

When
confronted by both a legal and factual sufficiency challenge, an appellate
court must first review the legal sufficiency of the evidence.  Glover v.
Texas Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex. 1981); In re
M.D.S., 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.).  Because
termination findings must be based on clear and convincing evidence, the
standard of review is not the same on appeal as a finding based upon a preponderance
of the evidence.  In re J.F.C., 96 S.W.3d 256, 264 (Tex. 2002). 
Therefore, in conducting a legal sufficiency review, we must look at all the
evidence in the light most favorable to the finding to determine whether a
reasonable trier of fact could have formed a firm belief or conviction that its
findings were true.  Id. at 266.  We must assume that the fact
finder settled disputed facts in favor of its finding if a reasonable fact
finder could do so and disregard all evidence that a reasonable fact finder
could have disbelieved or found incredible.  Id.  This does not
mean that we are required to ignore all evidence not supporting the finding
because that might bias a clear and convincing analysis.  Id.

The
appropriate standard for reviewing a factual sufficiency challenge to the
termination findings is whether the evidence is such that a fact finder could
reasonably form a firm belief or conviction about the truth of the petitioner=s allegations.  In re
C.H., 89 S.W.3d at 25.  In determining whether the fact finder has met
this standard, an appellate court considers all the evidence in the record,
both that in support of and contrary to the trial court=s findings.  Id. at 27-29. 
Further, an appellate court should consider whether disputed evidence is such
that a reasonable fact finder could not have reconciled that disputed evidence
in favor of its finding.  In re J.F.C., 96 S.W.3d at 266. 

This
standard retains the deference an appellate court must have for the fact finder=s role.  In re C.H.,
89 S.W.3d at 26.  Additionally, the trier of fact is the exclusive judge of the
credibility of the witnesses and the weight to be given their testimony.  Nordstrom
v. Nordstrom, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997,
pet. denied).  Thus, our review must not be so rigorous that only fact findings
established beyond a reasonable doubt could withstand review.  In re C.H.,
89 S.W.3d at 26.

 

 

 

Best Interest of the Child

In
his first and second issues, F.R.O. argues that the evidence is legally and factually
insufficient to support the jury’s finding that termination of the parent-child
relationship was in the child’s best interest. 

In
determining the best interest of the child, a number of factors have been
considered, including (1) the desires of the child; (2) the emotional and
physical needs of the child now and in the future; (3) the emotional and
physical danger to the child now and in the future; (4) the parental abilities
of the individuals seeking custody; (5) the programs available to assist these
individuals; (6) the plans for the child by these individuals; (7) the
stability of the home; (8) the acts or omissions of the parent that may
indicate the existing parent-child relationship is not a proper one; and (9)
any excuse for the acts or omissions of the parent.  Holley v. Adams,
544 S.W.2d 367, 371-72 (Tex. 1976).

This
list is not exhaustive, but simply indicates considerations that have been or
could be pertinent.  Id.  However, the best interest of the child
does not require proof of any unique set of factors nor limit proof to any
specific factors.  In re D.M., 58 S.W.3d 800, 814 (Tex. App. Fort
Worth 2001, no pet.).  The Holley test focuses on the best
interest of the child, not the parent=s
best interest.  Dupree v. Texas Dep=t of Protective & Regulatory Servs.,
907 S.W.2d 81, 86 (Tex. App.–Dallas 1995, no writ).  While incarceration is a
factor in determining the best interest of a child, it is not dispositive.  In
re C.T.E., 95 S.W.3d 462, 466 (Tex. App.–Houston [1st Dist.] 2002, pet.
denied).  In determining the weight of this factor, the court should consider
the expected length of an appellant=s
imprisonment and whether it can be inferred from an appellant=s criminal conduct that he
has endangered the safety of the child.  Id.  We consider the Holley
factors below.

The
desires of the children

K.O.
was too young to testify regarding her desires. Betty Witherspoon, a case work
supervisor with CASA, testified that she was appointed as K.O.’s guardian ad
litem in March or April 2009. Although K.O. cannot speak, Witherspoon stated
that most children desire that they not be born exposed to drugs; however, K.O.
was exposed to drugs at the prenatal stage and tested positive for drugs at
birth. 

 

 

The
emotional and physical needs of the children now and in the future

            F.R.O.
admitted that he does not own a vehicle nor has his driver’s license been
reinstated after it was suspended as a result of his conviction for driving
while intoxicated.  He lives seven miles outside the city limits of Palestine
and, for transportation, relies on his neighbor, friends in Narcotics or
Alcoholics Anonymous (NA or AA), or rural transport. 

K.O.’s
foster mother testified that the child was two months old when she came into
her and her husband’s home.  When K.O. first arrived at their home, she was
constipated, was not in a routine, had some medical problems, was behind on one
or two shots, and had to have another “foot prick.”  Currently, K.O. attends
daycare.  In July 2010, her foster parents noticed some changes in K.O.’s
behavior that, eventually, they connected to her visitations with F.R.O.  These
changes included becoming very clingy towards the foster mother on the day
after visitation, and waking up crying at night.  The foster mother testified
that she has never seen K.O. continuously cry in the presence of someone with
whom she was not familiar. 

The
emotional and physical danger to the children now and in the future

F.R.O.
admitted that he used illegal drugs and abused alcohol almost all of his life.
F.R.O. also admitted using heroin, marijuana, PCP, mushrooms, peyote,
methamphetamines, and crack cocaine, and abusing prescription drugs.  He has
been in drug rehabilitation five times. F.R.O. also admitted suffering from
bipolar disorder that he controls with medication.  He stated that he is
currently taking nonnarcotic medications for sleeping, back pain, hypertension,
muscle pain, and anxiety. 

            F.R.O.
admitted that he and L.F., K.O.’s mother, used cocaine within a week of K.O.’s
birth, and that K.O. was born one month premature, tested positive for cocaine
at birth, and, initially, had problems feeding. F.R.O. stated that he tested
positive for cocaine sometime after K.O.’s birth.  He testified that K.O. was
released from the hospital to L.F.’s mother, that the Department’s safety plan
allowed him to stay with K.O. during the day, and that neither parent was
allowed unsupervised contact with K.O.  During this time, F.R.O. admitted that
he and L.F. continued to use cocaine even though they were trying to stay
clean. On one occasion, F.R.O. and L.F. were found with K.O. unsupervised. He
could not recall if he tested positive for cocaine, but agreed that both of
them were asked to leave L.F.’s mother’s house. F.R.O. admitted that K.O. was
placed in foster care soon after this incident.

F.R.O.
testified that he was arrested for driving while intoxicated in 1987, convicted
for driving while intoxicated and a state jail felony theft in 2006, arrested
for driving while intoxicated in 2008, and arrested for possession of cocaine
and attempted tampering with physical evidence on April 18, 2009.  F.R.O. was
sentenced to seven years of probation for the 2008 driving while intoxicated
offense, and six months in state jail for the 2009 possession and tampering
offense.  After his arrest in April 2009, F.R.O. remained incarcerated until he
was released from a state jail facility in October 2009.  F.R.O. is on
probation for five and one-half more years.  He stated that conditions of his
probation include paying court costs and attorney’s fees, although he had not
begun making these payments. 

F.R.O.
admitted using cocaine once after he was released from state jail. F.R.O.
stated that he decided to change his life because he was “sick and tired” of
living this way.  According to F.R.O., he was clean for forty days before
entering drug rehabilitation in January 2010.  He testified that a March 2010
urine test was negative, but the hair follicle test was positive, although the
levels were “extremely low.”  He attends five to seven NA meetings a week, and
stated that he knows how to avoid relapse and “assure[s] the jury” that he will
take those steps.  

Tonya
Fuller, a family based safety services caseworker with the Department, stated
that she was the caseworker for F.R.O. and L.F. when K.O. was less than a month
old.  According to the safety plan, K.O. was placed in the care of her maternal
grandmother, and the parents were allowed supervised visitation.  At one point,
Fuller called to schedule a visit with K.O. and was informed by the maternal
grandmother that she had allowed the parents to leave with the child. Further,
both parents informed Fuller in March 2009 that they had relapsed on cocaine.
Fuller stated that K.O. was removed from the maternal grandmother’s house
shortly thereafter. 

Julia
Booth, a conservatorship supervisor with the Department, stated that she has
known F.R.O. and K.O. since K.O. was two and one-half months old.  After the
Department took conservatorship of K.O., F.R.O. continued with the service plan
given to him by Fuller as part of the Department’s service plan. After his
release from jail, Booth testified that F.R.O. has completed some of his
service plan including a required psychological evaluation, a drug
rehabilitation program, counseling for drug dependency, submitting to drug
screens, and attending parenting classes.  Even though Booth stated that the
Department waited three months after F.R.O.’s last reported date of drug use to
conduct a drug test, F.R.O.’s hair follicle test was positive, although the
level was very low. 

Lisa
Gaines, a friend of F.R.O.’s, stated that she has known F.R.O. since they met
in 2004 at an AA meeting.  She stated that she and F.R.O. attend the same NA
and AA group, but admitted that she has never been to his home or been involved
in his personal life.  However, she mentioned that F.R.O. had a girlfriend. She
was aware that F.R.O. has relapsed more than once, the latest in the fall of
2009.  Since F.R.O.’s relapse, Gaines noticed that he seemed settled, focused,
and concerned about K.O.’s welfare.  She stated that he has a home, a good
attitude, and is reliable.  Gaines stated that in order to guard against
relapsing, a person needs a support group and must put their sobriety first. 

The
parental abilities of the parents seeking custody

F.R.O.
has two other children from a former marriage.  Since his divorce, he has seen
them only twice.  Even though he was granted the right to have possession of
his children during the summer, he has not exercised his visitation rights
because the children live in Harlingen. F.R.O. stated that after K.O. was born,
he saw her every day until March 2009.  F.R.O. stated that after being released
from jail, he began visitations with K.O. in March 2010.  During the
visitations, he and K.O. read books and play with toys.  He said that K.O.
liked to be rocked, drink her bottle, and go to sleep.  However, he stated that
K.O. “seemed like she was irritable,” tired, or “cranky” when she arrived.
F.R.O. stated that if she was irritable or cranky, he held her and rocked her
to sleep.  He admitted that on some of these visits, K.O. does not want to come
to him and that this behavior worsened at each visit.  F.R.O. also stated that
K.O. did not want to maintain eye contact with him, that she would scream and
cry at times, and that she did not want him to hold her. 

Fuller
stated that, during the time that F.R.O. had supervised contact with K.O., he
appeared to be attached to and love the child.  Booth stated that F.R.O. has
not demonstrated the benefit of parenting classes.  According to Booth, his
visits with K.O. have been very stressful for the child and very difficult to
watch.  She has not seen F.R.O. put K.O.’s needs ahead of his own.  However,
Booth stated that K.O. seemed like a normal, happy toddler with her foster
family.  According to Booth, the Department recommends that F.R.O.’s parental
rights be terminated and that K.O. be adopted by a permanent family.

Julieanne
D. Davis, Ph.D., a licensed professional counselor, stated that she was asked
to assess the quality and nature of the relationship between F.R.O. and K.O. 
At the time of the assessment, K.O. was eighteen months old, and Davis stated
that, when she collected K.O. from the caseworker, K.O. went willingly with her
into the playroom.  However, when she saw her father, she balked.  With some
encouragement, K.O. went into the playroom, but, Davis testified, “would hardly
look in [F.R.O.’s] direction.”  Davis stated that even though F.R.O.
continually tried to connect with and intermittently touch K.O., K.O. would not
respond.  According to Davis, K.O. was “still and quiet, almost as if she
wanted to be invisible.”  At some point, Davis, F.R.O., and K.O. attempted to
play with a dollhouse.  Only after F.R.O. left the room did K.O. play, make contact,
and giggle like a “normal 18-month old.”  Davis stated that when the visit was
over, F.R.O. picked up, kissed, and hugged K.O., but the child did not
reciprocate. 

According
to Davis, K.O. does not trust F.R.O., does not feel she can have her needs met
in a relationship with him, and is not comfortable with him.  She described
K.O.’s relationship with F.R.O. as “disorganized, disoriented attachment,” and
said that she had a “strong, avoidant reaction” to her father.  She stated that
K.O. was “shutting down” as a coping mechanism during her visit with F.R.O.  However,
she described K.O. as being a “pretty secure kid” when she was not faced with a
“perceived threat.”  Davis described F.R.O.’s attachment style as being in the
“fearful category,” and that he appeared to be uncomfortable becoming close to
others.  She also stated that it was difficult for F.R.O. to provide
appropriate emotional, responsive actions towards K.O.  Although Davis stated
that F.R.O. handled K.O.’s rejection and avoidance of him “fairly well,” she
noted that F.R.O. was in a supportive environment.  Davis was concerned that if
a person with a “fearful” attachment style, such as F.R.O., is in a stressful
situation, he may not be resilient enough not to become angry or upset with
K.O.’s rejection.  Based on her assessment, Davis stated that it did not appear
F.R.O. would be able to provide K.O. with the healthy, developmentally
appropriate and stable relationship that she needs and deserves.

Judy
Miles, a human services technician for the Department, stated that she
supervised three visits between F.R.O. and K.O.  In the first visitation she
supervised, Miles stated that K.O. was sitting on her lap when F.R.O. entered
the room.  She stated that K.O. “immediately started screaming and crying,” and
that F.R.O. came to sit beside them on a sofa.  Although K.O. continued to
scream and cry, F.R.O. “grabbed” K.O. from Miles within a few seconds.  Then,
he moved to a rocking chair with K.O. while the child continued to scream, cry,
and reach for Miles.  According to Miles, F.R.O. stated that K.O. “always”
behaved this way, but that he did not mind her “screaming and hollering”
because she would usually cry herself to sleep.  Although K.O. continued to
cry, F.R.O. refused to allow Miles to help.  She attempted to get K.O. to eat
lunch, but she refused.  According to Miles, K.O. cried until she finally went
to sleep. 

Miles
stated that on the next visit, K.O. behaved the same way towards F.R.O., crying
the entire time.  Even though Miles suggested that F.R.O. be patient with K.O.,
he continued to grab her from Miles, not understanding her suggestion that he
allow the child to become familiar with him before “grabbing” her.  On the
third visit, Miles stated that, again, F.R.O. grabbed K.O. when he entered the
room, sat down on the sofa, and K.O. began screaming, hollering, and crying.  According
to Miles, K.O.’s screaming and hollering became unbearable.  Even though they
moved to a room with a rocking chair, K.O. continued to cry.  At that point,
Miles told F.R.O. that she was stopping the visit because K.O. had been crying
for thirty-five minutes and would get sick.  She stated that F.R.O. had his
arms wrapped around the child and refused to let go while K.O. was grabbing for
her.  Finally, K.O. “grabbed” Miles and F.R.O. released her, stomping out of
the room and slamming the door.  Miles stated that in a similar situation with
another parent, the parent exhibited a lot of patience with his child, which
she did not see with F.R.O.  She also did not see F.R.O. giving K.O. any type
of comfort while she was crying or expressing any type of concern.

Witherspoon,
K.O.’s guardian ad litem, was concerned about F.R.O.’s parental abilities
because he does not have a relationship with his two older children and because
of the anxiety and trauma suffered by K.O. in visits with F.R.O.  Witherspoon
attended the first and last visitations between K.O. and F.R.O.  In the first
visit, she stated that K.O. was in a “very shut-down mode.”  Although K.O. was
sitting in F.R.O.’s lap, she was “vacant,” or, as Witherspoon described it, had
a “deer in the headlight look.”  The jury was shown a videotape of the last
visit between F.R.O. and K.O.  Witherspoon stated that the videotape was very
painful to film and watch because K.O. was in a “great deal of distress.”  According
to Witherspoon, K.O. was playing and interacting with other people before she
saw F.R.O.  Witherspoon stated that when Miles attempted to take K.O., F.R.O.
was “clamping down, holding” K.O. tighter in the rocking chair. 

Witherspoon
stated that F.R.O. totally disregarded the fact that it was not in K.O.’s best
interest to be traumatized and that she could become physically ill.  Further,
F.R.O. became engaged in a power struggle over K.O. that Witherspoon indicated
would be a concern with a strong willed child.  She testified that F.R.O.
lacked understanding or failed to acknowledge that when K.O. shuts down, goes
to sleep, or is screaming, that is not a healthy, normal interaction or
relationship.  From her observations, K.O. reacts differently to F.R.O. as
opposed to other children her age with parents who have been absent from their
lives. 

The
programs available to assist the parents

F.R.O.
stated that he has done everything on his current service plan.  He also stated
that he went to drug rehabilitation at the request of the Department, but
“really [did not] know that [he] needed rehab” because he knew, “to some
extent,” what to do.  Witherspoon testified that, although F.R.O. was aware of
substance abuse counseling, had been clean and sober at times, and had the
opportunity to visit and parent his child in the beginning, he chose to
continue using drugs, commit crimes, and separate himself from his child.  Even
though F.R.O. promises that he is going to do all that he can to make sure he
does not relapse, she does not believe this is adequate because combined with
K.O.’s  behavior, his stress level puts him at a higher risk of use. 

The plans
for the children by the parents

F.R.O.
stated that he has a room for K.O. at his mobile home with a “pack-n-play” for
her to sleep in and clothes.  If he had custody of K.O. and needed to take her
to a doctor’s appointment, he would seek transportation from his father,
neighbor, friends, K.O.’s maternal grandmother, or rural transport.  If F.R.O.
had custody of K.O. and had an appointment with his probation officer, he would
take K.O. with him or ask someone from NA or his father to babysit her. 

If
F.R.O.’s parental rights to K.O. were terminated, the foster parents would
consider adopting her. Witherspoon stated that F.R.O.’s “whole focus” is on AA
and NA. She did not believe that F.R.O. would be able to parent K.O. According
to Witherspoon, the Department recommended termination of F.R.O.’s parental
rights and adoption of K.O. by her current foster parents. She believed that
this was in K.O.’s best interest so that she can have a stable, secure
environment.

The
stability of the home

            F.R.O.
is disabled and unemployed.  His only income is a disability check each month
totaling $944.  Although he acknowledged that it may take more money than he
had to raise her, he stated that he will seek “help.”  He agreed that from the
time K.O. was born until he went to jail in April 2009, he was sometimes homeless
and living from place to place with friends. After he was released from jail,
he lived from place to place with friends, moved into a cottage, and then moved
into a two bedroom mobile home in July. 

Booth
stated that F.R.O. has not been able to obtain and maintain housing for at
least six months because he acquired his present residence only two months
prior to trial.  He has also been advised to look into a program to assist
individuals who have a disability and have difficulty finding work, but he has
not done so.  Booth was concerned about F.R.O.’s limited resources.  Booth and
Witherspoon admitted that they had not visited F.R.O.’s residence. 

The
acts or omissions of the parents that may indicate the existing parent-child
relationship is not a proper one

            F.R.O.
admitted that it was his fault that K.O. initially came into the care of the
Department.  He admitted that he had not offered to pay child support, although
he believed he bought K.O. some things.  Witherspoon stated that F.R.O.’s acts
included using drugs prior to K.O.’s birth, providing drugs to L.F., continuing
using drugs and participating in criminal activities after K.O.’s birth and
removal by the Department, refusing services at the beginning of the case, and
failing to promptly participate in services or inquire about K.O. after his
release from jail.  She is very concerned about F.R.O.’s past behavior in
choosing drugs over his two older children and K.O.  Witherspoon was also
concerned because she did not know that F.R.O. had a girlfriend even though the
Department had asked him several times about girlfriends.  She stated that
F.R.O.’s denial and lack of honesty concerned her. 

Any excuse
for the acts or omissions of the parents

F.R.O.
could not “guarantee” that he would not relapse, but said that it was in K.O.’s
best interest that his parental rights not be terminated because she was his
daughter and he loved her. Further, he stated that his lifestyle was different
now.  Witherspoon does not believe that there is any excuse for F.R.O.’s
actions that would provide justification for his remaining in K.O.’s life.
However, she believes that he is trying to make some changes.

Conclusion

Viewing
the evidence in the light most favorable to the finding, a reasonable fact
finder could have concluded that K.O. was born addicted to cocaine, that
F.R.O.’s sobriety was uncertain, that his home was unstable, that he lacked the
resources to provide for K.O., that he had repeated arrests and convictions,
and that his parenting abilities were poor.  Considering all the evidence in
relation to the best interest factors in the light most favorable to the
court's finding, we conclude a reasonable trier of fact could have formed a
firm belief or conviction that termination was in the best interest of the
child. 

Although
there is conflicting testimony, the jury could have disregarded F.R.O.’s
testimony that he could maintain his sobriety, and that he would take steps to
prevent a relapse. The jury could have also disregarded testimony that F.R.O.
would be able to parent K.O.  The jury could have found that F.R.O. failed to
parent his older two children, failed to demonstrate that he could parent K.O.,
failed to understand K.O.’s extreme reactions and distress when he appeared,
and failed to demonstrate concern over K.O.’s excessive behavior.  Although
there was some disputed evidence, this evidence was not so significant that a
reasonable trier of fact could not have reconciled this evidence in favor of
its finding and formed a firm belief or conviction that terminating F.R.O.’s
parental rights was in the best interest of K.O.  Accordingly, F.R.O.’s first
and second issues are overruled.

 

Disposition

Having
overruled the two issues presented by F.R.O. in this appeal, the judgment of
the trial court is affirmed.

 

 

                                                                                                Sam Griffith

                                                                                                         
Justice

 

 

 

 

 

Opinion delivered June 22, 2011.

Panel
consisted of Worthen, C.J., Griffith, J., and Hoyle, J.

 

 

 

 

 

(PUBLISH)

 









[1] K.O.’s mother, L.F., died in
August 2009.