# NO. 12-10-00336-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | § | APPEAL FROM THE 349TH |
|---|---|---|
| *IN THE INTEREST OF* | | |
| | § | JUDICIAL DISTRICT COURT |
| *K.O., A CHILD* | | |
| | § | ANDERSON COUNTY, TEXAS |

## *MEMORANDUM OPINION*

F.R.O. appeals the termination of his parental rights. In two issues, F.R.O. challenges the order of termination. We affirm.

## BACKGROUND

F.R.O. is the father of K.O., born January 7, 2009.[1] When K.O. was three months old, the Department of Family and Protective Services (the "Department") filed a first amended petition for protection of K.O., for conservatorship, and for termination of F.R.O.'s parental rights. The Department was appointed temporary managing conservator of K.O. At the conclusion of the trial on the merits, the jury found, by clear and convincing evidence, that F.R.O. had engaged in one or more of the acts or omissions necessary to support termination of his parental rights, and that termination of the parent-child relationship between F.R.O. and K.O. was in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between F.R.O. and K.O. be terminated. This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53

---

[1] K.O.'s mother, L.F., died in August 2009.

S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). A termination decree is "complete, final, irrevocable [and] divests for all time the parent and child of all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.) Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley*, 543 S.W.2d at 352; *In re Shaw*, 966 S.W.2d at 179. However, parental rights are not absolute, and it is vital that the emotional and physical interests of the child not be sacrificed at the expense of preserving that right. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

A court can order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (Vernon Supp. 2010); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. TEX. FAM. CODE ANN. § 161.001(1) (Vernon Supp. 2010); *Green v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2) (Vernon Supp. 2010); *In re J.M.T.*, 39 S.W.3d at 237. Additionally, both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

Due process requires a petitioner to justify termination by clear and convincing evidence because termination is such a drastic remedy. *In re J.M.T.*, 39 S.W.3d at 237. The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2008). There is a strong presumption that the best interest of the child is served by preserving the parent-child relationship. *Wiley*, 543 S.W.2d at 352; *In re J.M.T.*, 39 S.W.3d at 240. Thus, the burden of proof is upon the person seeking to deprive the parent of their parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

## STANDARD OF REVIEW

When confronted by both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). Because termination findings must be based on clear and convincing evidence, the standard of review is not the same on appeal as a finding based upon a preponderance of the evidence. *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Therefore, in conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *Id*. at 266. We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id.* This does not mean that we are required to ignore all evidence not supporting the finding because that might bias a clear and convincing analysis. *Id.*

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d at 25. In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id.* at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266.

This standard retains the deference an appellate court must have for the fact finder's role. *In re C.H.*, 89 S.W.3d at 26. Additionally, the trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied). Thus, our review must not be so rigorous that only fact findings established beyond a reasonable doubt could withstand review. *In re C.H.*, 89 S.W.3d at 26.

In his first and second issues, F.R.O. argues that the evidence is legally and factually insufficient to support the jury's finding that termination of the parent-child relationship was in the child's best interest.

In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

This list is not exhaustive, but simply indicates considerations that have been or could be pertinent. *Id.* However, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d 800, 814 (Tex. App. Fort Worth 2001, no pet.). The *Holley* test focuses on the best interest of the child, not the parent's best interest. *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.–Dallas 1995, no writ). While incarceration is a factor in determining the best interest of a child, it is not dispositive. *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.–Houston [1st Dist.] 2002, pet. denied). In determining the weight of this factor, the court should consider the expected length of an appellant's imprisonment and whether it can be inferred from an appellant's criminal conduct that he has endangered the safety of the child. *Id.* We consider the *Holley* factors below.

*The desires of the children*

K.O. was too young to testify regarding her desires. Betty Witherspoon, a case work supervisor with CASA, testified that she was appointed as K.O.'s guardian ad litem in March or April 2009. Although K.O. cannot speak, Witherspoon stated that most children desire that they not be born exposed to drugs; however, K.O. was exposed to drugs at the prenatal stage and tested positive for drugs at birth.

*The emotional and physical needs of the children now and in the future*

F.R.O. admitted that he does not own a vehicle nor has his driver's license been reinstated after it was suspended as a result of his conviction for driving while intoxicated. He lives seven miles outside the city limits of Palestine and, for transportation, relies on his neighbor, friends in Narcotics or Alcoholics Anonymous (NA or AA), or rural transport.

K.O.'s foster mother testified that the child was two months old when she came into her and her husband's home. When K.O. first arrived at their home, she was constipated, was not in a routine, had some medical problems, was behind on one or two shots, and had to have another "foot prick." Currently, K.O. attends daycare. In July 2010, her foster parents noticed some changes in K.O.'s behavior that, eventually, they connected to her visitations with F.R.O. These changes included becoming very clingy towards the foster mother on the day after visitation, and waking up crying at night. The foster mother testified that she has never seen K.O. continuously cry in the presence of someone with whom she was not familiar.

*The emotional and physical danger to the children now and in the future*

F.R.O. admitted that he used illegal drugs and abused alcohol almost all of his life. F.R.O. also admitted using heroin, marijuana, PCP, mushrooms, peyote, methamphetamines, and crack cocaine, and abusing prescription drugs. He has been in drug rehabilitation five times. F.R.O. also admitted suffering from bipolar disorder that he controls with medication. He stated that he is currently taking nonnarcotic medications for sleeping, back pain, hypertension, muscle pain, and anxiety.

F.R.O. admitted that he and L.F., K.O.'s mother, used cocaine within a week of K.O.'s birth, and that K.O. was born one month premature, tested positive for cocaine at birth, and, initially, had problems feeding. F.R.O. stated that he tested positive for cocaine sometime after K.O.'s birth. He testified that K.O. was released from the hospital to L.F.'s mother, that the Department's safety plan allowed him to stay with K.O. during the day, and that neither parent was allowed unsupervised contact with K.O. During this time, F.R.O. admitted that he and L.F. continued to use cocaine even though they were trying to stay clean. On one occasion, F.R.O. and L.F. were found with K.O. unsupervised. He could not recall if he tested positive for cocaine, but agreed that both of them were asked to leave L.F.'s mother's house. F.R.O. admitted that K.O. was placed in foster care soon after this incident.

F.R.O. testified that he was arrested for driving while intoxicated in 1987, convicted for driving while intoxicated and a state jail felony theft in 2006, arrested for driving while intoxicated in 2008, and arrested for possession of cocaine and attempted tampering with physical evidence on April 18, 2009. F.R.O. was sentenced to seven years of probation for the 2008 driving while intoxicated offense, and six months in state jail for the 2009 possession and tampering offense. After his arrest in April 2009, F.R.O. remained incarcerated until he was released from a state jail facility in October 2009. F.R.O. is on probation for five and one-half more years. He stated that conditions of his probation include paying court costs and attorney's fees, although he had not begun making these payments.

F.R.O. admitted using cocaine once after he was released from state jail. F.R.O. stated that he decided to change his life because he was "sick and tired" of living this way. According to F.R.O., he was clean for forty days before entering drug rehabilitation in January 2010. He testified that a March 2010 urine test was negative, but the hair follicle test was positive, although the levels were "extremely low." He attends five to seven NA meetings a week, and stated that he knows how to avoid relapse and "assure[s] the jury" that he will take those steps.

Tonya Fuller, a family based safety services caseworker with the Department, stated that she was the caseworker for F.R.O. and L.F. when K.O. was less than a month old. According to the safety plan, K.O. was placed in the care of her maternal grandmother, and the parents were allowed supervised visitation. At one point, Fuller called to schedule a visit with K.O. and was informed by the maternal grandmother that she had allowed the parents to leave with the child. Further, both parents informed Fuller in March 2009 that they had relapsed on cocaine. Fuller stated that K.O. was removed from the maternal grandmother's house shortly thereafter.

Julia Booth, a conservatorship supervisor with the Department, stated that she has known F.R.O. and K.O. since K.O. was two and one-half months old. After the Department took conservatorship of K.O., F.R.O. continued with the service plan given to him by Fuller as part of the Department's service plan. After his release from jail, Booth testified that F.R.O. has completed some of his service plan including a required psychological evaluation, a drug rehabilitation program, counseling for drug dependency, submitting to drug screens, and attending parenting classes. Even though Booth stated that the Department waited three months after F.R.O.'s last reported date of drug use to conduct a drug test, F.R.O.'s hair follicle test was positive, although the level was very low.

6

Lisa Gaines, a friend of F.R.O.'s, stated that she has known F.R.O. since they met in 2004 at an AA meeting. She stated that she and F.R.O. attend the same NA and AA group, but admitted that she has never been to his home or been involved in his personal life. However, she mentioned that F.R.O. had a girlfriend. She was aware that F.R.O. has relapsed more than once, the latest in the fall of 2009. Since F.R.O.'s relapse, Gaines noticed that he seemed settled, focused, and concerned about K.O.'s welfare. She stated that he has a home, a good attitude, and is reliable. Gaines stated that in order to guard against relapsing, a person needs a support group and must put their sobriety first.

*The parental abilities of the parents seeking custody*

F.R.O. has two other children from a former marriage. Since his divorce, he has seen them only twice. Even though he was granted the right to have possession of his children during the summer, he has not exercised his visitation rights because the children live in Harlingen. F.R.O. stated that after K.O. was born, he saw her every day until March 2009. F.R.O. stated that after being released from jail, he began visitations with K.O. in March 2010. During the visitations, he and K.O. read books and play with toys. He said that K.O. liked to be rocked, drink her bottle, and go to sleep. However, he stated that K.O. "seemed like she was irritable," tired, or "cranky" when she arrived. F.R.O. stated that if she was irritable or cranky, he held her and rocked her to sleep. He admitted that on some of these visits, K.O. does not want to come to him and that this behavior worsened at each visit. F.R.O. also stated that K.O. did not want to maintain eye contact with him, that she would scream and cry at times, and that she did not want him to hold her.

Fuller stated that, during the time that F.R.O. had supervised contact with K.O., he appeared to be attached to and love the child. Booth stated that F.R.O. has not demonstrated the benefit of parenting classes. According to Booth, his visits with K.O. have been very stressful for the child and very difficult to watch. She has not seen F.R.O. put K.O.'s needs ahead of his own. However, Booth stated that K.O. seemed like a normal, happy toddler with her foster family. According to Booth, the Department recommends that F.R.O.'s parental rights be terminated and that K.O. be adopted by a permanent family.

Julieanne D. Davis, Ph.D., a licensed professional counselor, stated that she was asked to assess the quality and nature of the relationship between F.R.O. and K.O. At the time of the assessment, K.O. was eighteen months old, and Davis stated that, when she collected K.O. from

the caseworker, K.O. went willingly with her into the playroom. However, when she saw her father, she balked. With some encouragement, K.O. went into the playroom, but, Davis testified, "would hardly look in [F.R.O.'s] direction." Davis stated that even though F.R.O. continually tried to connect with and intermittently touch K.O., K.O. would not respond. According to Davis, K.O. was "still and quiet, almost as if she wanted to be invisible." At some point, Davis, F.R.O., and K.O. attempted to play with a dollhouse. Only after F.R.O. left the room did K.O. play, make contact, and giggle like a "normal 18-month old." Davis stated that when the visit was over, F.R.O. picked up, kissed, and hugged K.O., but the child did not reciprocate.

According to Davis, K.O. does not trust F.R.O., does not feel she can have her needs met in a relationship with him, and is not comfortable with him. She described K.O.'s relationship with F.R.O. as "disorganized, disoriented attachment," and said that she had a "strong, avoidant reaction" to her father. She stated that K.O. was "shutting down" as a coping mechanism during her visit with F.R.O. However, she described K.O. as being a "pretty secure kid" when she was not faced with a "perceived threat." Davis described F.R.O.'s attachment style as being in the "fearful category," and that he appeared to be uncomfortable becoming close to others. She also stated that it was difficult for F.R.O. to provide appropriate emotional, responsive actions towards K.O. Although Davis stated that F.R.O. handled K.O.'s rejection and avoidance of him "fairly well," she noted that F.R.O. was in a supportive environment. Davis was concerned that if a person with a "fearful" attachment style, such as F.R.O., is in a stressful situation, he may not be resilient enough not to become angry or upset with K.O.'s rejection. Based on her assessment, Davis stated that it did not appear F.R.O. would be able to provide K.O. with the healthy, developmentally appropriate and stable relationship that she needs and deserves.

Judy Miles, a human services technician for the Department, stated that she supervised three visits between F.R.O. and K.O. In the first visitation she supervised, Miles stated that K.O. was sitting on her lap when F.R.O. entered the room. She stated that K.O. "immediately started screaming and crying," and that F.R.O. came to sit beside them on a sofa. Although K.O. continued to scream and cry, F.R.O. "grabbed" K.O. from Miles within a few seconds. Then, he moved to a rocking chair with K.O. while the child continued to scream, cry, and reach for Miles. According to Miles, F.R.O. stated that K.O. "always" behaved this way, but that he did not mind her "screaming and hollering" because she would usually cry herself to sleep.

Although K.O. continued to cry, F.R.O. refused to allow Miles to help. She attempted to get K.O. to eat lunch, but she refused. According to Miles, K.O. cried until she finally went to sleep.

Miles stated that on the next visit, K.O. behaved the same way towards F.R.O., crying the entire time. Even though Miles suggested that F.R.O. be patient with K.O., he continued to grab her from Miles, not understanding her suggestion that he allow the child to become familiar with him before "grabbing" her. On the third visit, Miles stated that, again, F.R.O. grabbed K.O. when he entered the room, sat down on the sofa, and K.O. began screaming, hollering, and crying. According to Miles, K.O.'s screaming and hollering became unbearable. Even though they moved to a room with a rocking chair, K.O. continued to cry. At that point, Miles told F.R.O. that she was stopping the visit because K.O. had been crying for thirty-five minutes and would get sick. She stated that F.R.O. had his arms wrapped around the child and refused to let go while K.O. was grabbing for her. Finally, K.O. "grabbed" Miles and F.R.O. released her, stomping out of the room and slamming the door. Miles stated that in a similar situation with another parent, the parent exhibited a lot of patience with his child, which she did not see with F.R.O. She also did not see F.R.O. giving K.O. any type of comfort while she was crying or expressing any type of concern.

Witherspoon, K.O.'s guardian ad litem, was concerned about F.R.O.'s parental abilities because he does not have a relationship with his two older children and because of the anxiety and trauma suffered by K.O. in visits with F.R.O. Witherspoon attended the first and last visitations between K.O. and F.R.O. In the first visit, she stated that K.O. was in a "very shut-down mode." Although K.O. was sitting in F.R.O.'s lap, she was "vacant," or, as Witherspoon described it, had a "deer in the headlight look." The jury was shown a videotape of the last visit between F.R.O. and K.O. Witherspoon stated that the videotape was very painful to film and watch because K.O. was in a "great deal of distress." According to Witherspoon, K.O. was playing and interacting with other people before she saw F.R.O. Witherspoon stated that when Miles attempted to take K.O., F.R.O. was "clamping down, holding" K.O. tighter in the rocking chair.

Witherspoon stated that F.R.O. totally disregarded the fact that it was not in K.O.'s best interest to be traumatized and that she could become physically ill. Further, F.R.O. became engaged in a power struggle over K.O. that Witherspoon indicated would be a concern with a strong willed child. She testified that F.R.O. lacked understanding or failed to acknowledge that

9

when K.O. shuts down, goes to sleep, or is screaming, that is not a healthy, normal interaction or relationship. From her observations, K.O. reacts differently to F.R.O. as opposed to other children her age with parents who have been absent from their lives.

*The programs available to assist the parents*

F.R.O. stated that he has done everything on his current service plan. He also stated that he went to drug rehabilitation at the request of the Department, but "really [did not] know that [he] needed rehab" because he knew, "to some extent," what to do. Witherspoon testified that, although F.R.O. was aware of substance abuse counseling, had been clean and sober at times, and had the opportunity to visit and parent his child in the beginning, he chose to continue using drugs, commit crimes, and separate himself from his child. Even though F.R.O. promises that he is going to do all that he can to make sure he does not relapse, she does not believe this is adequate because combined with K.O.'s behavior, his stress level puts him at a higher risk of use.

*The plans for the children by the parents*

F.R.O. stated that he has a room for K.O. at his mobile home with a "pack-n-play" for her to sleep in and clothes. If he had custody of K.O. and needed to take her to a doctor's appointment, he would seek transportation from his father, neighbor, friends, K.O.'s maternal grandmother, or rural transport. If F.R.O. had custody of K.O. and had an appointment with his probation officer, he would take K.O. with him or ask someone from NA or his father to babysit her.

If F.R.O.'s parental rights to K.O. were terminated, the foster parents would consider adopting her. Witherspoon stated that F.R.O.'s "whole focus" is on AA and NA. She did not believe that F.R.O. would be able to parent K.O. According to Witherspoon, the Department recommended termination of F.R.O.'s parental rights and adoption of K.O. by her current foster parents. She believed that this was in K.O.'s best interest so that she can have a stable, secure environment.

*The stability of the home*

F.R.O. is disabled and unemployed. His only income is a disability check each month totaling $944. Although he acknowledged that it may take more money than he had to raise her, he stated that he will seek "help." He agreed that from the time K.O. was born until he went to jail in April 2009, he was sometimes homeless and living from place to place with friends. After

he was released from jail, he lived from place to place with friends, moved into a cottage, and then moved into a two bedroom mobile home in July.

Booth stated that F.R.O. has not been able to obtain and maintain housing for at least six months because he acquired his present residence only two months prior to trial. He has also been advised to look into a program to assist individuals who have a disability and have difficulty finding work, but he has not done so. Booth was concerned about F.R.O.'s limited resources. Booth and Witherspoon admitted that they had not visited F.R.O.'s residence.

*The acts or omissions of the parents that may indicate the existing parent-child relationship is not a proper one*

F.R.O. admitted that it was his fault that K.O. initially came into the care of the Department. He admitted that he had not offered to pay child support, although he believed he bought K.O. some things. Witherspoon stated that F.R.O.'s acts included using drugs prior to K.O.'s birth, providing drugs to L.F., continuing using drugs and participating in criminal activities after K.O.'s birth and removal by the Department, refusing services at the beginning of the case, and failing to promptly participate in services or inquire about K.O. after his release from jail. She is very concerned about F.R.O.'s past behavior in choosing drugs over his two older children and K.O. Witherspoon was also concerned because she did not know that F.R.O. had a girlfriend even though the Department had asked him several times about girlfriends. She stated that F.R.O.'s denial and lack of honesty concerned her.

*Any excuse for the acts or omissions of the parents*

F.R.O. could not "guarantee" that he would not relapse, but said that it was in K.O.'s best interest that his parental rights not be terminated because she was his daughter and he loved her. Further, he stated that his lifestyle was different now. Witherspoon does not believe that there is any excuse for F.R.O.'s actions that would provide justification for his remaining in K.O.'s life. However, she believes that he is trying to make some changes.

*Conclusion*

Viewing the evidence in the light most favorable to the finding, a reasonable fact finder could have concluded that K.O. was born addicted to cocaine, that F.R.O.'s sobriety was uncertain, that his home was unstable, that he lacked the resources to provide for K.O., that he had repeated arrests and convictions, and that his parenting abilities were poor. Considering all the evidence in relation to the best interest factors in the light most favorable to the court's

11

finding, we conclude a reasonable trier of fact could have formed a firm belief or conviction that termination was in the best interest of the child.

Although there is conflicting testimony, the jury could have disregarded F.R.O.'s testimony that he could maintain his sobriety, and that he would take steps to prevent a relapse. The jury could have also disregarded testimony that F.R.O. would be able to parent K.O. The jury could have found that F.R.O. failed to parent his older two children, failed to demonstrate that he could parent K.O., failed to understand K.O.'s extreme reactions and distress when he appeared, and failed to demonstrate concern over K.O.'s excessive behavior. Although there was some disputed evidence, this evidence was not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that terminating F.R.O.'s parental rights was in the best interest of K.O. Accordingly, F.R.O.'s first and second issues are overruled.

## DISPOSITION

Having overruled the two issues presented by F.R.O. in this appeal, the judgment of the trial court is ***affirmed***.

**SAM GRIFFITH**
Justice

Opinion delivered June 22, 2011.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

12