

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00063-CV
_____

IN THE INTEREST OF L.M., JR., A CHILD

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 16-1374

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Moseley

# MEMORANDUM OPINION

In 2010, the 71st Judicial District Court of Harrison County terminated Maura's parental rights to her two oldest children, Caleb and Jason, after she executed a voluntary relinquishment of her parental rights.[1] Custody of Maura's third child, Liam, was awarded to Liam's father. In 2016, the Texas Department of Family and Protective Services (the Department) filed a petition to terminate Maura's parental rights to Liam. The trial court terminated Maura's parental rights after finding that: (1) she voluntarily left the child alone or in the possession of another without providing adequate support for the child and remained away for a period of at least six months, (2) the evidence established Section 161.003 grounds for involuntary termination of her parental rights because she was unable to care for Liam as a result of mental illness, and (3) termination of her parental rights was in Liam's best interests. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(C), (b)(2), 161.003(a) (West Supp. 2018).

Conceding the statutory grounds for termination of her parental rights, Maura argues only that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in Liam's best interests. Because we conclude that sufficient evidence supported the trial court's best-interest finding, we affirm the trial court's judgment.

## I.     Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Indeed, parents have a fundamental

---

[1] To protect the confidentiality of the children involved, this Court will refer to all involved parties by fictitious names. *See* TEX. R. APP. P. 9.8(b)(C)(2).

2

right to make decisions concerning "the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). This Court is therefore required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id*. at 500. "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20).

In order to terminate parental rights, the trial court must find clear and convincing evidence that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2018); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" TEX. FAM. CODE ANN. § 101.007 (West 2014); *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). This standard of proof necessarily affects our review of the evidence.

In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing. *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine "whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations." *Id.* (quoting

3

*In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266.

Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "the rights of natural parents are not absolute; protection of the child is paramount." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26).

## II.     Sufficient Evidence Supported the Trial Court's Best-Interest Finding

Here, Maura challenges only the finding that terminating her parental rights was in Liam's best interests. "There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interests of the child, courts consider the following *Holley* factors:

(1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the

future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b) (West Supp. 2018). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

Proof of all of these factors is not a condition precedent to parental-rights termination. *Id.* at 27; *N.L.D.*, 412 S.W.3d at 819. Evidence relating to a single factor may suffice in a particular situation to support a finding that termination is in the best interests of the child. *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.) (citing *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 267 n.39).

Here, the first *Holley* factor weighs in favor of terminating Maura's parental rights. Liam was nine years old at the time of trial. Myrandi Williams, the Department's caseworker, testified that Maura had only seen Liam for a period of three months in the first three years of his life. Although Maura sporadically exercised her rights to visit with Liam in 2012 and 2013, Williams testified that Liam had not seen Maura for the past four years, had no relationship with her, and did not ask about her. Maura admitted that she had last seen Liam when he was four years old. According to Williams, Liam desired to be placed with a new family.

5

As to the second and third factors, Williams testified that Liam had been diagnosed with attention deficit hyperactivity disorder and reactive attachment disorder. According to Williams, Liam was in his third foster home because he "was having bonding issues" in his previous placements. Dr. William Andrew McBride, a clinical psychologist with East Texas Psychological Services, testified that Liam would need "consistent stability" as a result of his disorder. Yet, Williams testified that Maura would be unable to provide the emotional stability required to care for Liam. She informed the trial court that the Department first removed Caleb and Jacob from Maura's care after she was found in a shelter suffering from suicidal thoughts and post-partum depression. According to Williams, a psychological evaluation performed on Maura by Dr. Gerald E. Nissley, a licensed psychologist, concluded that Maura was unable to provide instructions necessary to assist Liam with his reactive attachment disorder. Williams relayed Nissley's conclusion that placing Liam with Maura would likely be detrimental to Liam's emotional health. We find that the second and third factors weigh in favor of terminating Maura's parental rights.

The fourth factor also weighs against Maura. Nissley's notes documented that Maura was "hospitalized at Terrell State Hospital after suffering a closed head injury in . . . 2009 after allegedly being beaten by her boyfriend." McBride testified that Maura's injuries caused traumatic brain disorder and cognitive impairment and that she also had bipolar disorder and somatic symptom related disorder. He added that Maura "continues to test out as far as achieving at the third grade level or below." McBride's evaluation with Maura led him to conclude that she was unable to parent Liam "independently . . . without supervision and structure."

6

According to McBride, Maura's caregiver, Lori Shaw, helped Maura in taking her medicine because she could not do it herself, and Maura admitted that fact during her direct testimony. Maura further admitted that she could not care for Liam alone because her mental illness had gotten worse over time. When asked how she would help Liam if he became angry, she testified that she "would . . . like talk to him to put his plate away and like he can watch TV or go out on the playground or be in the pool and we can watch him, me and [Shaw], would watch him." Although Maura testified that she cleaned her cabin on her own and could cook, the evidence established that she lacked parental abilities due to her mental illness.

As to the fifth factor, the Department offered Maura a family service plan, which she completed. However, when asked if she was currently seeing a psychologist, counselor, or doctor to manage her medication, Maura testified, "I did counseling for a while and then I did it with myself and then I did it with [Shaw]." There was no indication as to whether the Department would be able to provide Maura with additional services. In light of Nissley and McBride's conclusions that Maura's condition would not subside and that she could not care for Liam alone, the trial court could have concluded that additional services would not aid Maura in caring for Liam.

Conflicting evidence was presented regarding the sixth and seventh *Holley* factors. Maura testified that she planned for Liam to live with her in Shaw's home. Shaw is a licensed adult foster care health care provider who contracted with the Texas Department of Age and Disability to provide services in her home. She maintained a large residence with "numerous small cabins," including one that had been occupied by Maura after a social worker referred her to Shaw six years

7

ago. A home visit determined that Liam would have his own bedroom if he were to stay with Maura and Shaw.

Shaw's sixteen-year-old son, Dakota, testified that he lived in the main residence of the Shaw home with his parents and little brother, Seth. Dakota testified that his father was a carpenter and mobile home mover and that Shaw made sure they went to school and enjoyed extracurricular activities, and Shaw disciplined them appropriately. Dakota testified that he loved his "great parents" and assured the court that he had never seen any family violence. Dakota added that Maura is the only person outside of the family who has lived there for several years, that she is considered as family, and that Liam would be welcome in the home. Shaw also testified that it was in Liam's best interests to live with her and Maura.

However, Williams testified that the Department's plan was to find a better home for Liam because she had concerns about the stability of Shaw's home. Williams testified that supervision by Shaw was inappropriate since she had no relationship with Liam, law enforcement had been called to her home twenty-eight times, and she "was arrested for hiding from law enforcement." Dakota testified that he never saw law enforcement at the home but admitted that his parents had been to jail "[a] few times over little things." Shaw admitted that she had been arrested, but testified that she was never convicted of a crime.

However, according to Williams, Shaw was ruled out by the Department as a proper placement because she had been the subject of an investigation by Adult Protective Services and had a "CPS history involving when she had attacked her daughter-in-law in 2015." Jessica Galindo, an investigator with Child Protective Services (CPS), testified that when Maura had

8

exercised her rights to visit with Liam years ago, Shaw called CPS numerous times to make several outrageous, false claims against the child's father and had refused to obey the trial court's prior custody orders by failing to timely return the child to his father. Galindo further stated that Shaw claimed, on numerous occasions, that "the Harrison County District Attorney's office, the Judge and the Marshall police department were collaborating to hide and murder children in Harrison County." Galindo testified that Liam had a black eye, a cut on his ear, and infected bug bites when he was previously in Maura's and Shaw's care. She concluded that it was not in Liam's best interests to live with Shaw.

Case supervisor, Mallory Waugh-Brown, testified that Adult Protective Services had determined that Shaw was exploiting a woman in her care by taking the woman's money and failing to provide her medication. Waugh-Brown testified that CPS had received an allegation that Shaw had assaulted her daughter-in-law while children were present. She stated that Shaw had been arrested for interfering with an emergency telephone call and that her husband had obtained a restraining order against her.

Shaw denied making the calls containing the outrageous claims against Liam's father that were referenced by Galindo and testified that the CPS case was dismissed because the incident surrounded her grandchildren's mother's drug use. Shaw agreed that her husband claimed she had hit him in the head with a trophy, but stated that the case was dismissed. However, Shaw later admitted that she had called law enforcement and reported that her husband had abused her, but that law enforcement officers declined to arrest him because they determined that her wounds were self-inflicted. During a home visit, Waugh-Brown testified that Maura claimed there were

9

concealed handguns scattered throughout Shaw's residence, but Maura, Dakota, and Shaw testified that there were no guns in the home. Although the evidence on the sixth and seventh *Holley* factors was conflicting, we find that it was legally and factually sufficient for the trial court, as fact-finder, to have resolved the conflicts in the testimony and weighed these factors against Maura.

As to the last two *Holley* factors, the evidence established that Maura had not exercised her rights to visit Liam, even though she was named as a joint managing conservator for most of his life. Instead, the record showed that she last saw the child when he was four years old. It was undisputed that Maura's acts or admissions were the result of mental illness. Yet, even if we were to find the last *Holley* factor in Maura's favor, the fact that she could not care for Liam on her own as a parent was uncontested.[2]

After weighing the *Holley* factors, we conclude that the trial court's best-interest finding was supported by legally and factually sufficient evidence. Accordingly, we overrule Maura's points of error on appeal.

## III.     Conclusion

We affirm the trial court's judgment.


Bailey C. Moseley
Justice

Date Submitted:        November 16, 2018
Date Decided:          November 19, 2018

---

[2]Maura testified that she intended to obtain a license to carry concealed guns.