# Supreme Court of Texas

No. 24-0307

In the Interest of H.S., B.S., and M.S., Children

On Petition for Review from the
Court of Appeals for the Second District of Texas

**Argued September 9, 2025**

JUSTICE YOUNG delivered the opinion of the Court, in which Chief Justice Blacklock, Justice Busby, Justice Sullivan, and Justice Hawkins joined.

JUSTICE LEHRMANN filed an opinion dissenting in part, in which Justice Bland and Justice Huddle joined.

Justice Devine did not participate in the decision.

Few principles in our history and traditions are as deeply rooted as the sanctity of the family. Fit parents, and not the government or anyone else, have the right and the corresponding responsibility to direct their children's upbringing and to be their children's primary source of protection and guidance. At the same time, a parent's inability or unwillingness to satisfy basic, minimum standards of care can lead to abuse or neglect, which justifies governmental intervention to protect the children. The desired outcome of that intervention is a family's rehabilitation, the restoration

of wayward parents to their proper roles, and the government's exit from the family's affairs. In extreme cases, however, parents can forfeit their parental status altogether. When that happens, the government invokes the judicial process to pursue the termination of parental rights, after which parents and their children become strangers in the eyes of the law.

The strong presumption is that termination is not in a child's best interest, so a parental-termination order must always be a last resort and never a first impulse. Such an order risks offending the laws of nature and is impermissible under the laws of the United States and of Texas absent clear and convincing evidence both that the parent failed to discharge his obligations to his child and that the termination of parental rights is in the child's best interest. These heightened standards are required because termination affects the fundamental rights of all involved—not just of parents to their children but also of children to their parents.

This case requires us to apply these principles with respect to a married couple with three children. The government sought termination of both parents' rights to each child. A jury determined that the requisite grounds for termination had been proven as to both parents, and the trial court rendered judgment accordingly. The court of appeals affirmed. We likewise affirm as to Father, but we hold as a matter of law that the government has failed to establish that termination of Mother's rights is in the children's best interest. As to Mother, therefore, we reverse and render.

## I

By the time the government got involved, Mother had already endured a lifetime of trauma. As a child, she was "molested," "raped," and "abused," and the incident of rape was posted online. And while still a

2

child—just 16 years old—she began a romantic relationship with Father, then a 24-year-old man, who had "groomed" her. She became pregnant at age 17 and gave birth to Henry in May 2014, several months after she turned 18. Mother and Father married in July 2014, about a month after Henry was born. Two other children followed: Beth in 2016 and Mary in 2019. We deploy the pseudonyms used by the court of appeals rather than the children's true names.

The marriage was often rocky. Father allegedly had an "interest in porn [that] had gone to some extreme tastes and that had caused some extreme problems in their relationship." Father wanted to engage in sexual practices to which Mother would not consent. And Mother reported that Father would touch her sexually in front of the children and refuse to stop when asked.

Over the course of several years, Father exhibited "some bizarre behavior," repeatedly threatening to engage in, and actually engaging in, self-harm. On one occasion, Father drove his vehicle toward the family's home as if he were going to crash into it but "stopped really fast before he hit the house." The children were in the home at the time. Father was upset because Mother had reported that Father's 12-year-old son from a prior relationship, whom we call Adam and who occasionally lived with Mother and Father, had inappropriately touched other children.

When Mary was nine months old, Mother told Father that she wanted a divorce. Father grabbed a gun and threatened to shoot himself. Mother wrestled the gun away and was afraid that a child would be shot if the gun fired. During another argument, Father pulled a knife and threatened to stab himself. The children were in the home at the time.

On one occasion, Father threatened to hang himself. He put a rope around his neck, and Mother had to remove it. The children were in the home then, too. Mother called law enforcement, and Father was hospitalized for 24 hours.

Yet another time, Father slammed his head on a countertop while the children were in the home. Mother was "sure they heard something." Father also threatened to shoot himself with a nail gun because he "just does not take confrontation well." He and Mother were behind the home and the children were playing in the front yard. Mother claimed that she temporarily left Father after each of those incidents.

Father eventually combined self-harm with violence against Mother. During an argument in May 2022, Father grabbed Mother by her throat and slammed her down on top of his toolbox. He then hit his own head with a hammer and slammed his head into a wall. The children were in the home, and Henry may have witnessed the incident. Mother fled with the children and filed a police report. A warrant was issued for Father's arrest.

Ironically enough, in light of later developments, Mother's attempt to protect the family by reporting Father is what led to the State's initial involvement. The Department of Family and Protective Services sent a "Family-Based Safety Services specialist" to assist the family. As the specialist described her role, it was to "come in and help the family mitigate any safety concerns we have with them. I'll provide services to do that, and also connect them with resources within their community." She also warned Mother, however, that the department could remove the children if Mother allowed Father to be around them without a third party supervising the interaction. After Father was discovered back in the home,

the department removed the children and sued for conservatorship and termination.

Mother's family service plan indicated that the department's primary permanency goal was family reunification. The plan required Mother to undergo couples counseling with Father. Couples counseling was included in the plan because Mother and Father "were very adamant that they were going to stay together and they wanted to be together and work on their marriage."

At first, the parents made little progress on their court-ordered service plans that aimed to restore the family. Father appeared resistant. Mother explained that it was hard to get started with services because everyone was traumatized by the removal of the children. The parents refused to undergo drug testing because they were smoking marijuana. Mother once tested positive for other drugs, including methamphetamine.

On the other hand, visitation with the children went well at first. In November 2022, the caseworker reported that both Mother and Father had made all scheduled visits and that "[t]he visits have been good." But in February 2023, the children's attorney ad litem asked the court to suspend visitation after a particular visit ended poorly. The oldest child "had kind of attached himself to [Mother] and didn't want to go." Mother refused to force her child to part from her. Mother said something like, "I don't know why y'all are doing this to us, y'all should be going after other people," and the child responded, "Yes, God wants families to stay together, God wants everyone to be happy, God wants us all to be happy." Ultimately, law enforcement intervened to end the visit. The trial court granted the motion and indefinitely suspended all parental visitation with the children.

Even after the unfortunate visit that led to such a dire result, though, the attorney ad litem acknowledged that it was "very obvious these children love their parents" and "very obvious that these parents love these children." The attorney ad litem also confirmed that the goal was reunification—that "everybody" wanted the children "back home" with the parents.

After the court ordered the suspension of visitation, the parents twice moved for its resumption. At a hearing on one of those motions, a counselor testified that he had kicked Mother and Father out of his program. Another counselor testified that one of the children was "extremely worried" that one of her parents might die or that her parents were "going to break up." The counselor further testified that the children wanted to go home. And the counselor agreed that "maintaining a parent–child bond with each other is hard to do if there's no visitation allowed" and that it can make it harder for parents to demonstrate what they have learned in their services if they are not allowed to visit their children.

The department resolutely opposed the resumption of visitation, however, and the trial court refused to allow the parents to see their children. Thus, from the ill-starred visit in which the children and parents had to be physically separated due to their emotional refusal to do so voluntarily, the family went nearly seven months without seeing each other even once until the trial. As far as we are aware, the parents have not seen their children since then, either.

Meanwhile, far from being in adoptive placements, the children were foundering in the foster system. There is evidence that they had exhibited some negative behaviors and signs of distress even before removal. For example, the jury heard evidence that Henry had been suspended from his

school because he had "stabbed a student in the face, in the eye." After removal, there were signs that the children had witnessed domestic violence. Their play exhibited themes of aggression, violence, and fear. And the children had apparently witnessed an incident "of Mom trying to get away from Dad" involving "[k]icking a window out" and "blood."

But it was after being taken from their parents and denied visitation that the children fell into a downward spiral. Henry, the eldest, was not even in foster care anymore. He had been placed "in a mental health facility," and his foster mother would not take him back. One of his younger sisters was also "in a mental health facility." A counselor testified that Mary had "extreme temper tantrums" and that Beth had tried "to kill a peer in the home." The counselor testified that there were multiple factors impacting the children's behavior but that being removed from their parents and denied all access to them could be one of them. The counselor also agreed that "having to go to a psychiatric treatment facility would indicate that [Beth's] behaviors [were] worsening" and testified that "anything related to this CPS case or this family triggers these behaviors in these children." According to the counselor, and consistent with ordinary human experience, "removal from parents for children can be a very traumatizing event" because the children are "taken from their family[,] they're not given much explanation," and then they "go with a stranger to a strange . . . house."

In August 2023, Mother filed a motion requesting that the court retain the suit on its docket and set a new dismissal date under Family Code § 263.401(b). At the hearing on the motion, Mother's attorney emphasized how far Mother had progressed on her "services with regard to parenting,"

7

many of which she had fully completed and through which she was showing her progress. One service that she had not completed, he observed, was counseling. But that was because, at an earlier hearing, the trial court had learned that the parents were attending counseling together by Zoom and had ordered the department to provide individual, in-person counseling. According to Mother's attorney, the department had not provided in-person counseling to Mother because "they only have Zoom counseling available." The attorney also noted that, by that point, Mother had not been allowed to visit her children in seven months, making it difficult to demonstrate progress or develop the kind of evidence that would help establish her fitness at trial.

The trial court refused to extend the case, and the trial proceeded as scheduled in September 2023. The jury heard evidence of Father's self-harm and the May 2022 domestic violence against Mother. Mother admitted that she had allowed the children to remain in "endangering" conditions and that she and Father had engaged in conduct that endangered the children. When asked about divorcing Father, Mother testified that she considered divorce to be just as traumatizing to children as witnessing violence.

Throughout the trial, the department, the children's attorney ad litem, and their witnesses emphasized not only Father's violence but also Mother's alleged inability or unwillingness to protect the children by distancing herself from Father. They portrayed the parents' relationship as "enmeshed"—which was not a "healthy dynamic" in their view. They were critical of Mother's decisions to allow Father around the children. And Mother's loyalty to Father was a major theme in the closing

arguments of both the department and the attorney ad litem.

One of Mother's counselors testified to the difficulty victims of domestic violence can have in admitting that they are victims. He spoke of the "power of control wheel," a device for understanding the tools that a batterer uses to control the victim. The counselor had seen positive changes in Mother during her counseling and testified that some victims take longer than she did to make progress. Mother may also have had difficulty opening up to her counselors at the beginning because of trauma from her own childhood. But despite the abuse she had endured, there was evidence of the services that Mother had completed or of which she was nearing completion. For example, Mother completed courses in parenting skills, anger management, positive discipline, parenting styles, understanding brain development, developing self-worth, strengthening communication, making rules and enforcing consequences, managing feelings, domestic violence, and "victims intervention prevention." The jury also heard evidence that Mother had completed other service-plan requirements, such as having a valid driver's license, maintaining stable housing, undergoing a substance-abuse assessment, completing couples counseling with Father, and having a negative drug test. By the time of trial, Mother was "calmer, she thinks more, she's more assertive."

The jury found that Mother and Father each committed acts prohibited under paragraphs D, E, and O of Family Code § 161.001(b)(1) and that termination as to both parents was in each child's best interest under § 161.001(b)(2). In accordance with the jury's verdict, the trial court signed a final order that terminated Mother's and Father's parental rights to each of their children and appointed the department as the children's

9

permanent managing conservator.

The court of appeals affirmed. 710 S.W.3d 248, 279 (Tex. App.—Fort Worth 2024). It first held that the trial court did not abuse its discretion in denying Mother's request to extend the case because Mother had not shown that extraordinary circumstances justified an extension. *Id.* at 272. According to the court of appeals, Mother was at fault for failing to complete her services. *Id.* The court then held that legally and factually sufficient evidence supported each of the jury's findings. *Id.* at 272–79. The court determined that Father remained a threat to the children and that Mother was "unwilling to leave Father for the children's well-being" in part because of "her statements regarding divorce," *id.* at 278—that is, "because she considered divorce and witnessing physical violence in the home to be equally traumatic to children," *id.* at 260. And, in the court's view, the fact that Mother "still maintained a relationship with Father" was a factor that weighed in favor of terminating Mother's parental rights. *Id.* at 279. We granted Mother's and Father's petitions for review.

## II

We begin with Mother's appeal. We hold that the denial of Mother's motion to extend the trial date was reversible error. Because we further conclude that the evidence at trial was legally insufficient to sustain the finding that termination of her parental rights is in the children's best interest, we also render judgment for Mother.

## A

Trial was set for September 11, 2023. Several weeks before that, Mother asked the court to set a "new dismissal date," which would have

had the effect of allowing the court to retain the case on its docket and hold trial at a later date. By that point, Mother had completed or made significant progress on all her services, with the exception of in-person individual counseling because, despite being ordered by the court, it had not been made available by the department before trial.

Mother simultaneously renewed her request for resumed visitation with the children, which had been blocked by court order for the seven months leading up to trial. Without visitation, she could not establish through interaction with the children that her progress had borne fruit; without setting a new dismissal date, there would be no chance for such visits before trial. The children, moreover, were faring poorly in their current placements, so rushing toward termination was not urgent in the way that it might be if, for example, there were adoptive parents anxious to proceed.

The department nonetheless opposed the extension and, on the ground that resuming visits would be pointless if the trial proceeded forthwith, it opposed reinstatement of visitation. The trial court denied both motions, so the trial proceeded on September 11.

Mother's request to set a new dismissal date arose in a legal context distinct to parental-termination proceedings. Compared to ordinary civil litigation, judges have limited discretion to retain parental-termination cases on their dockets or to delay trials. As we discuss in greater detail in another case decided today, the legislature does not allow children to indefinitely remain in the department's care as their parents' termination cases linger in the trial court. *See In re C.S.*, ___ S.W.3d ___ (Tex. June 5, 2026). Instead, the legislature has created an extraordinary mechanism

11

that automatically strips trial courts of jurisdiction over termination cases that do not timely proceed to trial. If the trial has not begun and the court has not granted a lawful extension a year after the department was appointed as a child's temporary managing conservator, "the suit is automatically dismissed without a court order." Tex. Fam. Code § 263.401(a). And the court may not grant an extension necessary to retain the case on its docket

> unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child.

*Id.* § 263.401(b). "If the court makes those findings, the court may retain the suit on the court's docket for a period not to exceed 180 days after the time described by Subsection (a)." *Id.* It is often the department that seeks the extension available under § 263.401. *E.g.*, *In re G.X.H.*, 627 S.W.3d 288, 292–93 (Tex. 2021). Here, it was Mother.

The statute does not define "extraordinary circumstances." But its text and context provide guidance about the term's scope. If the court ordered "a parent to complete a substance abuse treatment program" and the court is considering whether to find extraordinary circumstances, the court "shall consider whether the parent made a good faith effort to successfully complete the program." Tex. Fam. Code § 263.401(b-2). And the statute *requires* the court to find extraordinary circumstances if "(1) a parent of a child has made a good faith effort to successfully complete the service plan but needs additional time; and (2) on completion of the service plan the court intends to order the child returned to the parent." *Id.* § 263.401(b-3). This Court has also given at least some guidance. For

12

example, we implicitly found that a parent's last-minute jury demand was an extraordinary circumstance justifying an extension. *See In re J.S.*, 670 S.W.3d 591, 606 (Tex. 2023) ("Trial courts should not fear reversal when they grant a parent's last-minute jury trial request and fail to use the magic words 'extraordinary circumstances' in discussing the resulting logistical difficulties.").

In other words, while the statute mandates finding extraordinary circumstances under the particular conditions it identifies, it does not foreclose finding extraordinary circumstances in other situations and does not purport to demarcate the outer boundary of circumstances that may be extraordinary. A trial court could abuse its discretion either in finding or in refusing to find extraordinary circumstances.

In this case, § 263.401(b-3) did not itself mandate that the trial court find extraordinary circumstances because the record does not show that, at the time Mother moved for an extension, the court intended to return the children to her after she completed the service plan. *See* Tex. Fam. Code § 263.401(b-3)(2). But when evaluating the trial court's decision to deny the extension, we remain mindful that this is no ordinary civil case. "[P]arental-termination cases stand apart from the rest of civil litigation in multiple important ways." *D.V. v. Tex. Dep't of Fam. & Protective Servs.*, 722 S.W.3d 854, 858 (Tex. 2025). Such proceedings "[should] be strictly scrutinized." *Id.* (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). That is because parental rights are "unique among all other claims in our civil legal system." *Id.* And "[t]ermination of parental rights is traumatic, permanent, and irrevocable." *In re M.S.*, 115 S.W.3d 534, 549 (Tex. 2003).

The circumstances here *were* extraordinary. Mother initially struggled to comply with the department's demands, in part because they challenged some of her closely held beliefs. For example, Mother was reluctant to take certain psychiatric medications or to allow her children to take them unless "absolutely needed." Mother also had a difficult time with the idea of Father being absent from the home, because he was her husband and the children's father. But after years in Father's shadow, Mother was beginning to take responsibility for her actions. She acknowledged that she and Father "had some struggles getting started" on services. She learned how to act more appropriately when receiving bad news about her children. And she understood that the children were removed because they had been in danger of domestic violence. Mother testified that she had been continuously engaging in services for 23 weeks and that she believed herself to be doing what she had been asked to do: make progress.

As we have described, not all the delays in Mother's services were attributable to her. The trial court had stated on the record that the judge "was not a big fan of Zoom counseling" and amended the court's order to require Mother to receive in-person counseling. (Notably, the discussion about the need for in-person counseling occurred during a hearing over Zoom.) But Mother contends, and the department does not dispute, that it had not made in-person counseling available despite being ordered to do so by the court, apparently because only Zoom counseling was available until shortly before trial. The department does note that the parents had been "booted" from counseling providers and that they were "on a waiting list for in-person counseling."

14

No matter what type of counseling Mother received or how successful she was in her services, it would have been hard for her to demonstrate her newly honed skills because she had not been allowed to visit her children for nearly seven months. It is difficult to understand how a court or the department could expect a family to survive when the parents are required to separate from each other *and* from their children for months at a time. Force a family to play dead long enough, and it may eventually die in truth.

At least as significant, though, was the children's condition at the time of the hearing on Mother's extension motion. To say that they were not thriving would be an understatement. Although there was evidence that the children were affected by having witnessed domestic violence before their removal, they suffered a sharp decline after being separated from their parents. Henry was in a psychiatric hospital, and Beth had been in one too. Even after being in the department's "physical custody" for "about 11 months," Mary was "extremely traumatized and demonstrate[d] anxiety and severe behavioral meltdowns that result[ed] in screaming tantrums [up] to 45 minutes at a time." None of the children was yet in an adoptive placement.

Much of the hearing on Mother's extension motion consisted of testimony from a counselor. The counselor agreed that "a child having to go to a psychiatric treatment facility would indicate that her behaviors are worsening." But the counselor was reluctant to agree that visitation should be resumed, even with a counselor present, because the children had "significant trauma triggers" that the counselor had observed "throughout this case." That is, according to the counselor, "[w]hen a caseworker shows

15

up, when C[ASA] shows up, when they visit with [Henry], anything related to this CPS case or this family triggers these behaviors in these children." The counselor then confirmed that seeing the caseworker and seeing the CASA volunteer "triggers trauma." Yet the counselor admitted that *those* visits had *not* stopped, even though the children could not see their own parents—and even though a counselor could have been present to oversee the visits.

At the time of the hearing, therefore, these facts were undisputed:

- Mother was making progress on her services despite being denied access to her children;

- the parents were on a waitlist for in-person counseling;

- all three children had significant behavioral issues that worsened throughout the department's custody;

- two children had been sent to psychiatric hospitals; and

- the department had found no adoptive placements for the children.

Given these facts, mindful that "involuntary termination statutes are strictly construed in favor of the parent," *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985), and in recognition of the heightened standard of appellate review, we hold that Mother demonstrated extraordinary circumstances as required for the trial court to retain the suit and that extending the case was in the children's best interest. *See* Tex. Fam. Code § 263.401(b). The court should have given Mother additional time to complete her remaining services and reunite with her children.

## B

If the only error committed below had been the trial court's failure to retain jurisdiction, perhaps the appropriate remedy would be to remand

16

the case for a new trial. But we need not decide that question because this error snowballed into another one. By denying the extension and proceeding to trial, the court cut short the process that seemed poised to lead to this family's reunification, or at least the reunification of Mother and the children. And given that the process was still in full swing, we hold that the department failed to present legally sufficient evidence that termination of Mother's parental rights was in the children's best interest at the time of trial. For that reason, we render judgment.

**1**

We begin by describing the standard of review for legal sufficiency in parental-termination cases. Among the prerequisites for termination is that the court must find by clear and convincing evidence that termination is in the child's best interest. *Id.* § 161.001(b)(2). That heightened standard should not be treated as a formality. It is not even *just* a statutory requirement—as if the legislature could, if it chose, deploy the usual preponderance standard. To the contrary, as this Court has held, constitutional law requires the heightened standard, which is therefore not merely a matter of legislative grace. *See In re G.M.*, 596 S.W.2d 846, 846–47 (Tex. 1980). Later, the U.S. Supreme Court confirmed that under the Due Process Clause of the Fourteenth Amendment, "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by *at least* clear and convincing evidence." *Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982) (emphasis added).

The clear-and-convincing standard is not just an instruction to be read to a jury; it instead has meaningful implications on appeal. "As a

17

matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). Accordingly, we have instructed the courts of appeals on the enhanced nature of *factual*-sufficiency review in parental-termination cases. *See id.* at 25–26; *see also, e.g.*, *In re A.B.*, 437 S.W.3d 498, 502–03 (Tex. 2014). We do not today address those standards, or whether the court of appeals complied with them, because we conclude that the heightened nature of *legal*-sufficiency review resolves the case.

The legal-sufficiency question for this Court is whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We may not disregard undisputed evidence even if that evidence is inconsistent with the verdict or finding. *Id.*; *accord In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (noting that "in conducting a legal sufficiency review in a parental termination case, we must consider all of the evidence, not just that which favors the verdict"). Evidence that might be regarded as legally sufficient to sustain a judgment in a case involving the preponderance standard might constitute no evidence in a parental-termination case.

In short, the Family Code's imposition of the clear-and-convincing standard is a codification of a constitutional requirement, which in turn reflects that the rights of parents to their children (and vice versa) are fundamental rights of constitutional magnitude. *J.W.*, 645 S.W.3d at 740. That rationale explains why a lifetime protective order that essentially deprived a mother of her parental rights required clear and convincing

evidence, even though no statute expressly imposed that heightened standard. *Stary v. Ethridge*, 712 S.W.3d 584, 591–94 (Tex. 2025). And the People of Texas recently "enshrine[d]" the rights and responsibilities of parents in our Constitution, observing that they "are deeply rooted in this nation's history and traditions" and include *both* "the responsibility to nurture and protect the parent's child *and* the corresponding fundamental right to exercise care, custody, and control" over the child. Tex. Const. art. I, § 37 (emphasis added).

For constitutional reasons, therefore, we must strictly scrutinize termination proceedings and construe involuntary termination statutes strictly in the parent's favor. *Holick*, 685 S.W.2d at 20. Invoking the power of the State to sever familial bonds "is always the last resort," *D.V.*, 722 S.W.3d at 861, but is permissible to protect children from serious harm and allow them to be adopted into a loving family, *see* Chris Gottlieb, *A Path to Eliminating the Civil Death Penalty: Unbundling and Transferring Parental Rights*, 19 Harv. L. & Pol'y Rev. 43, 50 (2024) ("[I]n the 1950s, . . . a new legal concept—terminating parental rights—took hold in the law. Previously, parental rights were extinguished only at the moment a child was adopted. Parental rights were *transferred* in adoption proceedings, not terminated outside the context of an adoption." (footnote omitted)); Chris Gottlieb, *The Birth of the Civil Death Penalty and the Expansion of Forced Adoptions: Reassessing the Concept of Termination of Parental Rights in Light of Its History, Purposes, and Current Efficacy*, 45 Cardozo L. Rev. 1319, 1322–23 (2024) ("[V]irtually no attention has been paid to the fact that until relatively recently it was entirely unheard of to sever all of a child's parental ties because *no such legal step was available.*

The legal mechanism used to terminate parental rights, which is now ubiquitous in child welfare proceedings, did not exist until the mid-twentieth century and, when introduced, was rarely used.").

As everyone who practices family law in Texas knows, one of the tragedies of our age is that there are far too many cases where this fearsome power is necessary and proper. But it may be exercised only in the absence of other legitimate options.

**2**

In this case, there were no allegations that Mother directly harmed any of the children or failed to care for them. Rather, the focus at trial was on Father's violence and Mother's ability or inability to protect the children from him. But when a parent's rights may be terminated based on a *spouse's* violence, the department should proceed with particular caution—especially when the spouse's violence is not directed at the children. *Cf. In re A.P.*, 672 S.W.3d 132, 132–33 (Tex. 2023) (Young, J., concurring in the denial of the petition for review) ("[P]recisely because termination is so serious, courts must ensure that the analysis does not reduce to inevitably terminating the rights of such a parent *because of* her status as a domestic-violence victim.").

More than 30 years ago, this Court heard *Lewelling v. Lewelling*, in which paternal grandparents sought to be appointed as managing conservators of a minor child rather than the child's mother. 796 S.W.2d 164, 165 (Tex. 1990). The Family Code required the grandparents "to show that awarding custody to the natural parent would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development." *Id.* (quotation marks omitted). The trial court ordered that the grandparents be named as managing

conservators. *Id.* The court of appeals affirmed, basing its decision largely on evidence that the father had physically abused the mother throughout their relationship. *Id.* at 165–66. The mother "had been hospitalized on several occasions as a result, once with a concussion from a blow to the head, and . . . this physical abuse continued during the time she was pregnant with [the child]." *Id.* at 165. In addition, although it was the mother's initiation of divorce proceedings that launched the custody dispute, there was evidence that the mother "continued to see [the father] after several incidents of physical abuse," "testified that she might consider a reconciliation if he sought counseling," and "continued to see [the father] during the pendency of the divorce when he came to visit [the child]." *Id.*

This Court reversed. *Id.* We noted that "[t]he presumption that the best interest of a child is served by awarding custody to a natural parent is deeply embedded in Texas law." *Id.* at 166. And we explained that the Family Code "require[d] the nonparent to offer evidence of specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." *Id.* at 167. The court of appeals had gone off track by focusing on the abuse that the mother allegedly suffered:

> Most importantly, the court of appeals seems to place great weight on the evidence relating to the alleged physical abuse of [the mother], without any evidence that such abuse would significantly impair [the child's] physical health or emotional development. *A parent should not be denied custody of a child based on the fact that he or she has been battered.* We hold that evidence that a parent is a victim of spousal abuse, by itself, is no evidence that awarding custody to that parent would significantly impair the child. Any other result is contrary to the public policy of our State.

*Id.* (emphasis added) (footnote omitted). And the Court further commented

on *why* it was important not to deprive a parent of her child just because that parent had been abused by her husband—even if there was evidence that she had not entirely severed her relationship with the abusive spouse:

> This includes evidence that [the mother] would return to her husband after being beaten by him, as well as the emotional complications inherent in such an abusive relationship. . . . Victims of spousal abuse are often reluctant to terminate the abusive relationship because of an overwhelming feeling of helplessness and a low self-esteem. A holding contrary to that which we reach today could only deter battered spouses from reporting their suffering lest they lose their children.

*Id.* at 167 n.6 (citation omitted).

A concurring justice emphasized that "[n]o one testified that [the mother] was in any way harmful to the child" and that "[h]er testimony that she loved the child was demonstrated by her actions." *Id.* at 169 (Cook, J., concurring). Two dissenting justices agreed that no evidence supported the trial court's decision, but given that they had "no way of knowing what may have happened to the child or the parties in the two years that this case has been on appeal," they would have remanded for further proceedings in the trial court rather than rendering judgment in the mother's favor. *Id.* at 175 (Hecht, J., dissenting). And even the one dissenting justice who thought that sufficient evidence supported the trial court's order may have viewed the case differently had it been about the termination of parental rights rather than just conservatorship; he chided the Court for "equat[ing] *conservatorship and possession* of a child with *involuntary termination* of parental rights," noting that "[i]nvoluntary termination of parental rights is permanent and irreversible" and that "the parent-child relationship is one of constitutional dimensions and should be disturbed only for the most compelling and serious of reasons." *Id.* at 173 (Gonzalez, J., dissenting).

22

The principle from *Lewelling* that a woman should not lose her child just because her husband abused her points to a grim reality—the dilemma faced by battered mothers who must choose between enduring the abuse or risk losing their children by seeking help.  One analysis of New York City's child-protection agency concluded:

> While the offending partner is the principal source of the mother's dilemmas, these are often exacerbated by the agencies to which the victim turns for help, particularly those agencies responsible for child protection—CPS and the courts. . . .  Current CPS policy and practice aggravate the battered mother's dilemma in a number of ways.  For instance, the increasing propensity for CPS agencies and courts to equate domestic violence with abuse or neglect means that if a mother reports domestic violence . . . she risks losing her child, an example of the battered mother's dilemma.  If she does not report, however, she risks further harm to herself or her child. . . .  Against the intimidating context in which safety concerns are unilaterally addressed, the CPS response is self-fulfilling: women are reluctant to report domestic violence until it escalates to a point where children face imminent danger.

Evan Stark, *The Battered Mother in the Child Protective Service Caseload: Developing an Appropriate Response*, 23 Women's Rts. L. Rep. 107, 125–26 (2002) (footnotes omitted).*

---

* *See also, e.g.*, Jaime Perrone, *Failing to Realize* Nicholson*'s Vision: How New York's Child Welfare System Continues to Punish Battered Mothers*, 20 J.L. & Pol'y 641, 669 (2012) (arguing that "[w]hen the primary reason for keeping a neglect proceeding against a nonviolent parent open is that her children have been exposed to domestic violence, CPS must prove that the child's life or health is at imminent risk warranting removal from the battered mother's care"); Amanda J. Jackson, Nicholson v. Scoppetta*: Providing a Conceptual Framework for Non-Criminalization of Battered Mothers and Alternatives to Removal of Their Children from the Home*, 33 Cap. U. L. Rev. 821, 867 (2005) ("Battered mothers should not be considered neglectful and unfit parents merely because they have

Unlike *Lewelling*, today's case *is* a termination case—one with potentially "permanent and irreversible" consequences. *See* 796 S.W.2d at 173 (Gonzalez, J., dissenting). We are therefore even more alert to the possibility that Mother may be blamed and punished for Father's actions, even if that is not the department's intent. And the record before us does indeed reveal that Mother is in this predicament primarily because of Father's actions, not because of her own faults. True, in the early days after the removal of her children, Mother was reluctant to cooperate with the department and was defensive of Father. She believed that the department made "false accusations" and "like[d] to distort things that come out of your mouth to where it fits them." And Mother would not agree, at first, to prevent Father from contacting the children when only she was supervising.

By the time of trial, though, the situation was markedly different. Mother now understood that Father's self-harm and domestic violence posed risks to the children, as voluminous undisputed testimony, most prominently from the department's own counselors and providers, made clear. The evidence showed that she understood her obligation to ensure that the children were not subjected to danger from Father going forward, that she was committed to complying with that obligation, and that she was capable of doing so even though she obviously hoped that Father's own progress would greatly diminish the likelihood that she would need to undertake protective actions. All this evidence directly addresses the legally

been abused by their partners in the presence of their children."); Justine A. Dunlap, *Sometimes I Feel Like a Motherless Child: The Error of Pursuing Battered Mothers for Failure to Protect*, 50 Loy. L. Rev. 565, 566 (2004) ("Children should not be taken away from their battered mothers because they have witnessed the abuse. This practice cruelly blames the mothers for being abused and harms the very children sought to be protected." (footnotes omitted)).

relevant question: not whether Mother is a victim of abuse herself, or whether Mother is unwilling to sever a relationship with her own husband despite departmental disapproval of such a choice, but whether Mother *can and will protect her children*, including from her husband and their father if necessary. *See, e.g.*, *J.W.*, 645 S.W.3d at 743 & n.10.

Moreover, to the extent that Mother did not demonstrate her willingness to prioritize her children as persuasively or as quickly as she might have, that was at least in part due to the lack of clarity in what the department intended to achieve and what it required of her. At an earlier hearing, the department's specialist unequivocally agreed that her goal was "to preserve the family unit and let the kiddos remain in the care and custody of at least one parent." The attorney ad litem had also urged the parents to "get the help that they need so that these children can return home." And the parents participated in couples counseling aimed at reconciliation and family reunification as part of their mandatory, court-ordered services. In other words, the department was signaling to Mother that she needed to work on her relationships with her husband and her children so that they could *all* be reunited.

At the same time, however, the department's case against Mother was premised on her alleged unwillingness to separate from Father. For example, in its closing argument, the department condemned Mother because she "did not kick [Father] out" and because "she's still with him." And Mother's connection to Father was the lead point in the attorney ad litem's closing argument: "[Mother], she's going to choose her husband above all. . . . How do we know this? Well, we know this because, for one, you've seen no affirmative action from her to do anything else. *They're still*

*together*." (Emphasis added.) The department's brief in this Court repeatedly refers to concerns about "Mother's and Father's enmeshed relationship." Married people typically have "enmeshed" relationships, which is in fact close to the very definition of marriage and what it requires.

To be clear, and as the department acknowledged during oral argument, this Court's precedent forecloses the department from demanding that Mother (or *any* parent) choose between divorcing her husband or losing her children. *See, e.g.*, *J.W.*, 645 S.W.3d at 743 n.10; *see also id.* at 754 (Young, J., concurring). But the department's arguments come perilously close to that line. They may well have crossed it at trial, and it appears that a major reason the court of appeals affirmed the best-interest determination as to Mother was that she had not permanently left Father and divorced him. *See, e.g.*, 710 S.W.3d at 277–78 (holding Mother's "statements regarding divorce" against her); *id.* at 279 (stating that "although Mother insisted that she would leave Father to get her children back, she had not done so"). We reiterate that neither the department nor any court of this State may, in the name of the People of Texas and their laws, demand divorce as a precondition for maintaining parental rights. A mother unfortunate enough to have a husband from whom their children must be protected cannot invoke the marriage to exempt herself from the duty of protecting the children, of course, and that may sometimes even leave her with little option but to see her husband only when the children are not present. But the government may never condition her status as a parent on her willingness to pursue divorce.

Imposing a demand for divorce is unlawful, and imposing such an unlawful demand *sub silentio* is even worse than demanding it overtly.

26

This case reflects the problem that can arise if the *real* goal—to separate a married couple—is communicated only indirectly, while a demand for the couple to reunite and thrive is made overtly. Generating such cognitive dissonance creates independent problems related to due process because parties cannot be expected to comply with orders that they cannot reasonably understand. There is every indication here that Mother never understood exactly what the department wanted. The testimony of one of the parents' counselors exemplifies this point with particular clarity. The counselor testified that he firmly believed that the children would not be endangered if they were returned to Mother. When the attorney ad litem asked him whether Mother had taken any actions to show that she would choose her children over Father, the counselor responded, "She hasn't been put in that position yet to make a choice." When asked to clarify, the counselor explained,

> She's trying to work it out with her husband, and then, you know, she wants to know what the CPS wants to do—that y'all make a choice and she'll choose her children.
>
> . . . .
>
> I guess she was waiting to see what y'all wanted—do y'all want them to split up? Do you want them to stay together?
>
> If she had a choice of either, A, getting the kids back or, B, staying with [Father] and not getting the kids back, she would leave.

So if even the *counselor* whom the department paid to work with Mother could not ascertain what the department's position really was, it is hardly surprising that Mother did not. Indeed, it is possible that even the department itself did not really know which of two opposing directions it

expected Mother to choose.

Notably, the record shows that Mother was even willing to comply with an illegal demand if that was what the department insisted upon for her to regain her children—if only she understood what the demand *was*. Any fit parent would likely succumb to nearly any demand if it was the price for reunification with her children, which is one reason for careful judicial scrutiny at every stage—to ensure that the massive power imbalance between the State and the parent is used only for proper purposes, like rehabilitating families. Here, though, Mother was operating in the dark and potentially acting at cross-purposes with the department without realizing it. On the one hand, she had to show that she would protect her children at any cost, and on the other hand, she had to show— because the service plan demanded that she show—that all five of them could remain a family. She was caught between her love for her husband (and her marriage vows to him) and her love for her children.

Despite being in such an unenviable position, Mother was making significant progress. She had completed most of her services by the time of trial. And as the department's caseworker acknowledged, Mother was on a waiting list to begin additional services, which obviously could have been a factor in her failure to fully complete her service plan.

The whole case, after all, began only because Mother herself alerted the authorities and departed with the children the first time Father's violence was exerted against *her*. Beyond protecting her own children, Mother had even managed to aid their half-brother, Adam, who had already turned 18 by the time the department removed Mother's children. When Adam was 12, Mother caught him inappropriately touching several

28

children who were not her own.  She also suspects that Adam may have molested Henry.  Mother reported the abuse, but when she found out that Adam had himself been sexually abused (apparently not by Father), she also sought to help Adam by facilitating his admission to "a second chance program" at an inpatient treatment facility.  Despite the sexual abuse she had suffered as a child and the difficult times she had endured in her marriage, Mother was still willing and able to shield others from similar abuse while even helping the perpetrator get the help that he needed—just as she did for her husband when he was mentally unstable and needed to be hospitalized.

In addition to all this, we again emphasize that the children were not thriving at the time of trial, nor were they in adoptive placements.  Instead, the children had shown a sharp decline since being separated from their parents.  Initially, the reports on the children were largely positive.  For example, at a hearing that took place about a month after the October 2022 removal, the caseworker reported that Beth and Mary were "both very sweet girls."  They were "doing well," and visits with the parents had "been good."  Henry was "very goofy and funny, and he enjoys building things with Legos.  He's very smart."

Contrasting those descriptions with what came later is heartbreaking.  By March 2023, Henry had become "aggressive with his sister" and had "actually hit her in the face."  After entering a new foster home, Henry had "regressed."  By May 2023, Mary's play was "full of themes of domestic violence, fighting, injury, fear, need for safety."  Beth "expresse[d] a lot of anxiety" and "a lot of worry and a lot of fear."  Understandably, Beth was "extremely worried about Mom and Dad."  And

29

by September 2023, Mary would have "extreme temper tantrums" lasting "up to 45 minutes at a time," Beth tried to kill another child, and both Henry and Beth had been sent to psychiatric hospitals. Indeed, Henry was still in a psychiatric hospital when the trial began. Although we do not doubt that the department was doing its best to help the children with its limited resources, whatever it was trying did not seem to be working. And it is difficult to say that more of the same would be in the children's best interest.

Just as striking as what the record contains is what it does *not* contain. Despite knowing that it bore a heightened evidentiary burden that would be strictly scrutinized on appeal, the department offered little to none of the kind of evidence we would expect in a termination case based on endangerment: medical records, criminal histories, police reports, or drug-testing records. When a family's continued existence is on the line and the department must produce clear and convincing evidence, Texas courts may not just presume that supporting evidence exists in some undisclosed location.

In sum, the department and the trial court short-circuited the process that could have led to reunification. The court refused to retain jurisdiction and extend the case, thereby depriving Mother of completing her few remaining services. The department had not given Mother a clear directive regarding Father. And the children were on a dangerous trajectory. For all these reasons, we conclude that a reasonable trier of fact could not have formed a firm belief or conviction that terminating Mother's parental rights was in the children's best interest. *See J.W.*, 645 S.W.3d at 741. We therefore reverse the court of appeals' judgment and render judgment dismissing the department's case against Mother. *Cf. HNMC, Inc. v. Chan*,

30

683 S.W.3d 373, 387 (Tex. 2024) (rendering a take-nothing judgment when the evidence was legally insufficient to support the jury's finding).

Because a best-interest finding is required for termination of parental rights, we need not consider whether sufficient evidence supports the jury's findings that Mother endangered the children or failed to complete her service plan. *See* Tex. Fam. Code § 161.001(b). Section 161.001(b)(2) imposes a separate best-interest requirement with independent force, and it is not automatically satisfied just because a parent committed one of the acts enumerated in subsection (b)(1). To be sure, evidence that supports a finding against a parent under (b)(1) may also be, and indeed often is, relevant to best interest under (b)(2). But subsection (b)(2) is not merely a box to check after determining that the requirements of (b)(1) have been satisfied, and heightened appellate review applies to both subsections. The two subsections are distinct—and require distinct scrutiny at all stages of the judicial process—because it may well be in the child's best interest to remain connected with the parent even after the parent has committed one of the actions described in (b)(1). That outcome may be especially likely when, as here, the parent is on the path to rehabilitation and reunification.

**3**

Our judgment in Mother's favor does not mean that the department must immediately return the children to Mother and have no further contact with her or the children. The record before us does not indicate what has happened since trial. It is at least possible, for example, that Mother is currently in no position to care for the children. If restoring them to her physical custody does not pose any such risk, however, that restoration should proceed; if material risks exist, the department has the

31

legal tools it needs to ensure the children's protection with the least amount of invasion into the family as possible.

In any event, in light of our disposition of Father's appeal, Mother will be the children's sole legal parent. That means that once the children are restored to her custody it will be up to Mother, and not Father, to determine whether and to what extent he plays a role in the children's lives. She will have the same authority as all other parents concerning interactions that her children have with others. And she will have the same solemn responsibility as all other parents, too, so if Mother endangers the children in the future, the department may assess whether it would be appropriate to seek relief—potentially including termination—based on that future behavior. But the department must now recognize Mother as the children's parent, with all the rights and obligations that status entails.

## III

We turn now to Father, and here the situation is very different. The department's case against Mother was premised on her alleged failure to protect the children from Father, and it was Father's behavior that directly threatened the family. It is therefore unsurprising that the result in Father's case diverges from the result in Mother's. The record in this case, partly summarized in this opinion, provides ample evidence from which the jury could conclude that he posed a substantial risk of harm to the children. That evidence was legally sufficient to support the jury's findings that Father endangered the children and that terminating his parental rights was in the children's best interest.

Nothing more is necessary for us to affirm the judgment of the court of appeals as to Father. Because it would not add to the jurisprudence of

the State, we decline to express any further views as to that court's reasoning. *See, e.g., Walker v. Baptist St. Anthony's Hosp.*, 703 S.W.3d 339, 345 (Tex. 2024); *Virlar v. Puente*, 664 S.W.3d 53, 66 (Tex. 2023); *Columbia Valley Healthcare Sys., L.P. v. A.M.A. ex rel. Ramirez*, 654 S.W.3d 135, 141 n.3 (Tex. 2022); *Regent Care of San Antonio, L.P. v. Detrick*, 610 S.W.3d 830, 839 & n.9 (Tex. 2020).

## IV

The judgment of the court of appeals with respect to Mother is reversed, and we render judgment in her favor. The judgment with respect to Father is affirmed.

Evan A. Young
Justice

**OPINION DELIVERED:** June 5, 2026

33